# Supreme Court of Florida

_____

No. SC11-1446
_____

**ANA MARIA CARDONA,**
Appellant/Cross-Appellee,

vs.

**STATE OF FLORIDA,**
Appellee/Cross-Appellant.

[February 18, 2016]

PER CURIAM.

Ana Maria Cardona, who was twenty-nine years old at the time of the crimes, was found guilty of the 1990 first-degree murder and aggravated child abuse of her three-year-old son, Lazaro Figueroa. Cardona appeals her convictions and the death sentence imposed for the murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

We are compelled to vacate Cardona's convictions and remand for a new trial based on the pervasiveness and the cumulative effect of the prosecutor's numerous improper closing arguments in the guilt phase, which repeatedly crossed the line this Court has clearly established regarding impermissible prosecutorial

comments. As we have stated for decades, we expect and require prosecutors, as representatives of the State, to refrain from engaging in inflammatory and abusive arguments, to maintain their objectivity, and to behave in a professional manner. See, e.g., Delhall v. State, 95 So. 3d 134, 170 (Fla. 2012); Brooks v. State, 762 So. 2d 879, 904-05 (Fla. 2000); Gore v. State, 719 So. 2d 1197, 1202 (Fla. 1998); Urbin v. State, 714 So. 2d 411, 418-22 (Fla. 1998).

Over sixty years ago, this Court stated:

> Under our system of jurisprudence, prosecuting officers are clothed with quasi judicial powers and it is consonant with the oath they take to conduct a fair and impartial trial. The trial of one charged with crime is the last place to parade prejudicial emotions or exhibit punitive or vindictive exhibitions of temperament.

Stewart v. State, 51 So. 2d 494, 495 (Fla. 1951). While prosecutors should be encouraged to prosecute cases "with earnestness and vigor," they are not at liberty to strike "hard blows." See Berger v. United States, 295 U.S. 78, 88 (1935).

Our decision is required by our prior precedent, which mandates reversal where a prosecutor "exceed[s] the bounds of proper conduct and professionalism and provide[s] a 'textbook' example of overzealous advocacy." Gore, 719 So. 2d at 1202. As we have previously emphasized, "[t]his type of excess is especially egregious in this, a death case, where both the prosecutors and courts are charged with an extra obligation to ensure that the trial is fundamentally fair in all respects." Brooks, 762 So. 2d at 905 (quoting Gore, 719 So. 2d at 1202).

- 2 -

The improper arguments in this case—including the prosecutor's inflammatory refrain of describing the purpose of the trial as seeking "justice" for the child victim and the prosecutor's repeated denigration of the defense's presentation as "diversionary"—pervaded the closing argument from beginning to end. Most of the improper comments were objected to, and those objections were overruled, amplifying the prejudicial effect of the comments by implicitly placing the trial court's imprimatur of approval on the remarks.

As we explain below, the trial court's error in allowing the prosecutor to repeatedly emphasize that the purpose of the trial was to obtain "justice for Lazaro," by itself, was not harmless beyond a reasonable doubt, and thus a new trial is warranted on this basis. However, our conclusion that a new trial is required is buttressed by the fact the prosecutor's closing argument was pervaded with a multitude of other improper comments that defense counsel preserved for appellate review. Accordingly, we reverse and remand for a new trial untainted by improper prosecutorial arguments that inflame the passions of the jury in this emotionally-charged case.

**FACTS**

Cardona was originally tried in 1992, found guilty of aggravated child abuse and first-degree murder, and sentenced to death. Cardona v. State, 641 So. 2d 361, 363 (Fla. 1994). This Court affirmed her convictions and death sentence in 1994.

Id. at 366. However, in 2002, through a subsequent postconviction appeal, this Court reversed the convictions and sentences because the State committed a Brady[1] violation by failing to disclose material criminal investigation reports of the State's interviews with Cardona's companion and codefendant, Olivia Gonzalez. Cardona v. State, 826 So. 2d 968, 970 (Fla. 2002). These reports contained significantly contradictory versions of the story pertaining to whether Gonzalez, rather than Cardona, was the primary perpetrator of the escalating child abuse that culminated in Lazaro's death. Id.

During the 2010 retrial, the State did not introduce the testimony of Gonzalez but instead relied primarily on circumstantial evidence to establish Cardona's guilt. The State presented extensive evidence about the condition of the young victim when he was found dead and also produced detailed testimony of the likely cause of the child's severe injuries.

The evidence established that employees of Florida Power & Light Company found the body of a three-year-old boy in the bushes in front of a Miami Beach home on the morning of November 2, 1990. The child was extremely thin, his bones were visible, and he had a large bruise near his right eye. He was dressed in blue gym shorts that covered a dirty diaper wrapped many times with

---

1. Brady v. Maryland, 373 U.S. 83 (1963).

brown packaging tape.  His t-shirt bearing a lollipop design would inspire the Miami Beach Police Department to dub the investigation to uncover the identity of the boy and the person responsible for the boy's death as the "Baby Lollipops" case.

The Miami Beach Police Department conducted door-to-door interviews, distributed flyers bearing this moniker in English and Spanish, held a news conference, and had detectives working on the case around the clock.  Ultimately, after receiving numerous leads, the police identified the child as three-year-old Lazaro Figueroa, the son of Ana Maria Cardona and Fidel Figueroa, who was murdered a month before Lazaro was born.

The autopsy revealed details about Lazaro's physical condition and the cause of death.  The medical examiner opined that Lazaro ultimately died on November 1, 1990, as a result of a significant blunt injury to the head that had occurred hours to days before his death.  This was reflected in a fresh fatal tear to the corpus callosum, the band of nerve tissue between the left and right sides of the brain.

The medical examiner found numerous other injuries to the body, ranging from hours- and days-old, to even months-old, injuries.  Lazaro was also malnourished, anemic, and dehydrated, weighing only 18 pounds.  His body was covered in scars and bruises, with bedsores from his head to his buttocks.  In the

opinion of the medical examiner, the cause of death was "child abuse syndrome," resulting from the cumulative effect of all of Lazaro's injuries, even though the injuries to the corpus callosum hastened his death.

The police pursued a lead that Cardona was the child's mother, and, in early December 1990, discovered that Cardona; her companion, Olivia Gonzalez; and Cardona's two other children had moved to Osceola County and were living together in a motel. When law enforcement located and confronted Cardona, she told detectives that Lazaro had been jumping on the bed, fell and hit his head on the tile floor, and that she tried to revive him with perfume and waited for Gonzalez to return home from work. She stated that she and Gonzalez decided to leave Lazaro in front of a "very beautiful home" because she thought "those people have money" and could take care of him.

The defense's theory during the retrial was that the State could not prove Cardona had Lazaro in her care during the last few months of his life. The defense also showed the plausibility that another suspect named Gloria Pi, who had been investigated and had allegedly confessed to killing a little boy, may have been involved.

At the conclusion of the guilt phase, the jury found Cardona guilty of aggravated child abuse and first-degree murder. A penalty phase was subsequently held, after which the jury recommended that Cardona be sentenced to death by a

bare majority vote of seven to five.  Ultimately, the trial court found one

aggravating circumstance, that the murder was especially heinous, atrocious, or

cruel (HAC), and gave it "overwhelmingly great weight."  After determining that

this aggravating circumstance outweighed all of the mitigation,[2] the trial court

---

2.  The trial court found one statutory mitigating circumstance—that Cardona had no significant criminal history—and assigned it little weight.  The trial court found eighteen nonstatutory mitigators, assigning them the following weights: (1) limited educational background (minimal weight); (2) limited intelligence (little weight); (3) lack of parenting by her father (slight weight); (4) emotional rejection by her biological mother (little weight); (5) trauma suffered as a child (minor weight); (6) arrival in the U.S., pregnant with no support system (no weight); (7) lack of reunification with her mother in the U.S. (little or no weight); (8) influences of other people, including the victim's father who was murdered (miniscule weight); (9) the 40-year sentence of her codefendant (no weight); (10) above average behavior during twenty years of incarceration and recognition as a model inmate (slight weight); (11) baptism in prison (minimal weight); (12) work as a trustee on a voluntary basis (little weight); (13) positive influence on fellow inmates, including helping them in difficult moments (slight weight); (14) makes correctional officer's job easier (minimal weight); (15) sincere spiritual growth (inconsequential weight); (16) participation in substance abuse programs (inconsequential weight); (17) reestablishment of a relationship with her adult children and the importance of the bond between her and her children (little weight); and (18) redemption (very little weight).

The trial court rejected three proposed statutory mitigating circumstances: (1) that Cardona committed the crime while under the influence of extreme mental or emotional disturbance; (2) that Cardona acted under extreme duress or under the substantial domination of another person; and (3) that her capacity to appreciate the criminality or to conform her conduct to the requirements of law was substantially impaired.  The trial court also rejected the following nonstatutory mitigators offered by Cardona: (1) Cardona was a battered woman; (2) Cardona suffers from dependent personality disorder; (3) the codefendant, companion Olivia Gonzalez, played a role in the crime; and (4) Cardona was remorseful.

imposed a death sentence for the murder and fifteen years in prison for aggravated child abuse.

## ANALYSIS

On appeal to this Court, Cardona raises ten claims.[3] We conclude that one of the claims—that the trial court erred in the guilt phase by allowing the prosecutor to engage in inflammatory, egregious, and legally improper closing argument—is dispositive. This error with respect to the State's closing argument was so detrimental that we must reverse, even though the State presented sufficient evidence in support of the jury's guilty verdict and, in the penalty phase, provided competent, substantial evidence to establish the existence of the single aggravating circumstance, HAC, beyond a reasonable doubt.

---

3. The ten claims raised by Cardona are: (1) the trial court erred in striking two jurors and in allowing the State to strike one juror; (2) the prosecutor improperly questioned its witness and commented on Cardona's silence, in violation of her constitutional rights; (3) the trial court erred by failing to conduct a proper inquiry after the State's expert changed his opinion; (4) the prosecutor made improper comments during the guilt-phase closing arguments, which violated Cardona's right to a fair trial; (5) the prosecutor made improper comments during the penalty-phase closing arguments; (6) the trial court erred in allowing the State to argue HAC based on acts remote from the immediate circumstances of the victim's death; (7) the trial court erred in sentencing Cardona to death based on facts not in evidence and imposing a nexus requirement on mitigation; (8) the trial court erred in denying Cardona's claim that she had an intellectual disability; (9) basing a death sentence on a bare seven-to-five jury recommendation violates Ring v. Arizona, 536 U.S. 584 (2002), and the Florida Constitution; and (10) the errors in this case had the cumulative effect of depriving Cardona of a fair trial, due process of law, and a reliable sentencing process.

- 8 -

Because the guilt-phase closing argument is dispositive, we do not address the remaining issues except for those likely to reoccur on retrial: (1) whether the trial court erred in refusing to consider certain IQ tests for purposes of Cardona's intellectual disability claim; and (2) the two cross-appeal claims raised by the State, that the trial court erred in refusing to permit its expert to testify in rebuttal during the penalty phase and in refusing to allow the State to introduce evidence to rebut the "no significant criminal history" mitigating circumstances.[4]

## I. Guilt-Phase Closing Argument

We first address Cardona's claim that the trial court erred in allowing the prosecutor to make improper comments during the guilt-phase closing arguments. The context for the numerous improprieties that pervaded the prosecutor's closing argument is the very nature of the case itself, which involved the tragic death of a three-year-old boy who suffered extensive injuries prior to and leading up to his death. Clearly, the graphic evidence of Lazaro's extensive injuries and ultimate death would be a cause for sympathy to the jurors who were to decide the guilt or innocence of Cardona, the child's mother.

---

4. Because we are granting a new trial, we need not address Cardona's claim under Ring v. Arizona, 536 U.S. 584 (2002), which has now been applied in Florida by the United States Supreme Court in Hurst v. Florida, 136 S. Ct. 616 (2016).

Yet, a bedrock principle of our criminal justice system is that every effort must be made in any trial—regardless of whether the case involves such heart-wrenching circumstances—to ensure that the jurors base their decision, not on sympathy for the victim or prejudice against the defendant, but solely on the facts elicited during trial and the law instructed by the trial court. The State's burden is to prove the elements of the crime beyond a reasonable doubt. When the State instead uses closing argument to appeal to the jury's sense of outrage at what happened to the victim and asks the jurors to return a verdict that brings "justice" to the victim, the State perverts the purpose of closing argument and engages in the very type of argument that has been repeatedly condemned as antithetical to the foundation of our criminal justice system that guarantees a fair trial to every accused.

In Ruiz v. State, this Court explained the role of attorneys in every criminal trial, emphasizing in particular the important role of the prosecutor:

> A criminal trial is a neutral arena wherein both sides place evidence for the jury's consideration; the role of counsel in closing argument is to assist the jury in analyzing that evidence, not to obscure the jury's view with personal opinion, emotion, and nonrecord evidence.

743 So. 2d 1, 4 (Fla. 1999). Further,

> The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. That same power and force allow him, with a minimum of words, to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has

- 10 -

> non-judicially reached conclusions on relevant facts which tend to show he is guilty.

Id. (quoting Hall v. United States, 419 F.2d 582, 583-84 (5th Cir. 1969)).

The role of the attorney in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence." Id. (citing United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978)). While "wide latitude is permitted in closing argument, . . . this latitude does not extend to permit improper argument." Gore, 719 So. 2d at 1200 (citation omitted). Closing argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant." Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985). A prosecutor must not "unduly create, arouse and inflame the sympathy, prejudice and passions of [the] jury to the detriment of the accused." Urbin, 714 So. 2d at 421 (quoting Barnes v. State, 58 So. 2d 157, 159 (Fla. 1951)).

In this case, defense counsel lodged a significant number of objections in the closing arguments alone and unsuccessfully sought a mistrial twice. We review trial court rulings regarding the propriety of comments made during closing argument for an abuse of discretion. Salazar v. State, 991 So. 2d 364, 377 (Fla. 2008). Where the comments were improper and the defense objected, but the trial court erroneously overruled defense counsel's objection, we apply the harmless error standard of review. See Snelgrove v. State, 921 So. 2d 560, 568 (Fla. 2005); Doorbal v. State, 837 So. 2d 940, 956-57 (Fla. 2003). This standard involves

placing "the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." Ibar v. State, 938 So. 2d 451, 466 (Fla. 2006) (citing State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986)).

The most troubling aspect of the prosecutor's closing argument in this case was the repeated references to seeking "justice for Lazaro," culminating in the statement that the "only verdict" that would provide this "justice" was a verdict of guilty of first-degree murder. But the improprieties hardly stopped there. In addition to the erroneous "justice for Lazaro" comments, other clearly improper arguments were made, including repeatedly denigrating the defense case and calling parts of the defense's presentation "diversionary tactics"; and making personal attacks on the defendant, such as calling Cardona a "drama expert" and comparing her to a character on a "telenovela."

We emphasize that the defense raised numerous objections to the clearly improper arguments, often at its own peril, and the trial court compounded the error by continually overruling these objections. In total, the defense counsel lodged fifty-eight objections throughout the State's closing and rebuttal closing arguments, including both general and specific objections—almost all of which were overruled. Only four defense objections were sustained and, in one instance,

the prosecutor actually repeated an improper comment <u>after</u> the trial court had sustained a defense objection.  Cardona also moved for a mistrial twice based on some of the comments, but those attempts were all unsuccessful.

A.  "Justice For Lazaro"

The first and most egregious category of clearly improper closing argument comments involves the State's repeated and erroneous statements that the case was about seeking "justice for Lazaro."  These arguments improperly inflamed the minds and passions of the jurors.  The prosecutor began the closing argument as follows:

> Prosecutor:  May it please the Court, defense counsel.  It's been a long couple of weeks, a tough case, and I want to thank you for your attention and I know it's been difficult.  But now we're at closing arguments, and it's really important.  <u>It's really, it's really important to stay focused on what this trial has been about from day one and that is justice for Lazaro</u>.  The defense gave you this.  They want you to play where's [the other suspect] Gloria, where's Gloria?  It's a diversionary tactic.
> Defense Counsel:  Objection.
> The Court:  Overruled.

(Emphasis added.)  Later in the closing argument, the prosecutor referred to "justice for Lazaro" again, while urging the jury to look at the photos of Lazaro's badly injured body:

> Prosecutor:  Aggravated child abuse.  You heard from Dr. Hyma . . . .  These photos, look at those photos.  I know it's difficult, it's really difficult.  <u>But this trial is about justice for Lazaro, and we who labor here seek only truth</u>.  You got to look at them.

- 13 -

(Emphasis added.)  Subsequently, the prosecutor again reminded the jury about the

state of Lazaro's body and urged the jury to seek "justice" for him:

> Prosecutor:  There were 47 injuries that he was able to identify on this kid.  Remember this trial, we who labor seek only the truth.  This trial is about justice for Lazaro.
> Defense Counsel:  Objection, inflames the jurors' passion and misstatement of the law.
> The Court:  Overruled.
> Prosecutor:  Justice for Lazaro.  Look at the evidence, read her statement, those injuries are listed for you. . . .

(Emphasis added.)  The prosecutor then ended her closing argument in the

following way:

> Prosecutor:  When you elect that foreman, you have to decide what's the truth here, but I'm going to ask you, remember, this trial is about justice for Lazaro.
> Defense Counsel:  Objection, inflames the jurors.
> The Court:  Sustained.
> Prosecutor:  I'm going to ask [that] when you go into that jury room, you find her guilty.
> Defense Counsel:  We have a motion—
> . . . .
> Prosecutor:  Guilty of first-degree murder as charged in the indictment.  This is the only verdict that's going to give justice for Lazaro.
> Defense Counsel:  Objection, improper argument.
> The Court:  Overruled.
> Prosecutor:  Thank you.

(Emphasis added.)

The prosecutor's use of "justice for Lazaro" as the theme of the closing

argument unquestionably crossed the line.  The argument that the case is about

"justice" for the victim or the victim's family has been uniformly condemned.  See

- 14 -

Davis v. State, 136 So. 3d 1169, 1197 (Fla. 2014) (determining the argument that the victim's siblings would want to know what justice was imposed for the victim's murder was improper); Dorsey v. State, 942 So. 2d 983, 986 (Fla. 5th DCA 2006) ("demanding justice for the victim" was improper); Shaara v. State, 581 So. 2d 1339, 1341 (Fla. 1st DCA 1991) (determining that "the prosecutor's comment that the victim was asking the jury for justice" was improper); Edwards v. State, 428 So. 2d 357, 359 (Fla. 3d DCA 1983) (criticizing the prosecutor's argument, which included: "All I'm going to ask you for is justice. I ask you for justice both on behalf of myself and the people of the State of Florida, also on behalf of [victim's] wife and children.").

As is evidenced by the case law, this type of comment has been considered improper under clearly established Florida law for over three decades, including in cases arising out of Miami-Dade County, the same location where Cardona's retrial was held. See Edwards, 428 So. 2d at 359. As the Third District stated in Edwards:

> The prosecutor's argument was an improper appeal to the jury for sympathy for the wife and children of the victim, the natural effect of which would be hostile emotions toward the accused. It is the responsibility of the prosecutor to seek a verdict based on the evidence without indulging in appeals to sympathy, bias, passion or prejudice. Harper v. State, 411 So. 2d 235 (Fla. 3d DCA 1982). . . .
>
> . . .

- 15 -

When it is made to appear that a prosecuting attorney's argument to the jury consists of an appeal to prejudice or sympathy calculated to unduly influence a trial jury, the trial judge should not only sustain an objection at the time to such improper conduct when objection is offered, but should so affirmatively rebuke the offending prosecuting officer as to impress upon the jury the gross impropriety of being influenced by improper arguments. Harper v. State, 411 So. 2d at 237, citing Deas v. State, 161 So. 729 (Fla. 1935).

Id.

Moreover, as in Edwards, the defense's objections in this case were overruled by the trial court without comment, which "stamped approval on the argument, thereby aggravating the prejudicial effect." Id.

In addition to overruling the objections, the trial court finally sustained one of the defense counsel's specific objections near the very end of the closing argument, only for the prosecutor to repeat the improper "justice for Lazaro" remark as the final line of the State's closing argument. The defense's objection to that comment was overruled, leaving the jury with the distinct impression that it was entirely proper to consider that a verdict of first-degree murder was the only way to obtain "justice for Lazaro." The trial court's error in overruling the objections was made worse by the fact that no curative instruction was ever given as to the "justice for Lazaro" comments.

The impermissible appeal to the jurors' emotions by emphasizing that the trial was about "justice for Lazaro" was exacerbated by the fact that in nearly the same breath as some of the "justice for Lazaro" comments, the prosecutor

- 16 -

attempted to shift the burden of proof beyond a reasonable doubt by urging the jury to convict Cardona based on what was "true" and linked "justice for Lazaro" with the "truth." As we have stated, "it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt." Gore, 719 So. 2d at 1200.

We conclude that the preserved improper "justice for Lazaro" comments, which pervaded the prosecutor's closing argument, were not harmless beyond a reasonable doubt. A new trial is therefore required. The existence of additional improper remarks—most of which were also preserved but some of which were not—further buttresses our conclusion that a new trial is necessary.

### B. Denigration of the Defense and the Defendant

The other improper remarks that pervaded the closing arguments and were preserved by contemporaneous objections include those in which the prosecutor denigrated the defense counsel and Cardona herself. The prosecutor did this by repeatedly accusing the defense of using "diversionary tactics." In the same vein, the prosecutor also warned the jurors that the defense would "cloud" and "muddle" the issues, mocked the defense closing argument as a "magnificent display . . . a real show" and suggested that defense counsel was being dishonest.

Cardona describes the prosecutor's use of the word "diversionary" as being the anchoring "refrain" of the State's closing argument. In fact, the "diversionary tactics" refrain was intertwined with the improper "justice for Lazaro" argument throughout the closing argument. For example, right after making the first "justice for Lazaro" argument, the State began its theme that the defense was a "diversionary tactic." After the defense's first objection was overruled, the prosecutor continued:

> Prosecutor: It's a diversionary tactic because they don't [want] you to focus on this statement, the statement that, that woman made on December 6, 1990. She had a lot to say, and in these words, if you listen to that statement, you read these words, you read in between the lines, you listen to what she says and what she doesn't say. And you get to the conclusion of what really happened to Lazaro. Diversionary tactics and—
> Defense Counsel: Objection to the diversion of the defense.
> The Court: Overruled.

(Emphasis added.)

The prosecutor repeated this "diversion" theme again and again. For instance, the prosecutor stated:

> They didn't know who [the child] was. This was out and about. Have you seen this little boy, who's this two-year-old boy? She saw it. She saw it her statement, page number 72. I saw it on the news. I wanted to call you, but I didn't. Where is Gloria? Diversionary tactic.

(Emphasis added.) And later still, the prosecutor continued with the refrain, stating "that is not the first time that he had a diaper taped to him for Lord knows how

- 18 -

long . . . . Taped to him.  So it's like a body cast.  That's outrageous.  That is outrageous.  Where is Gloria?  <u>Diversionary</u>."  (Emphasis added.)  The prosecutor also accused the defense of "cloud[ing]" and "muddl[ing]" the issues.  The defense counsel objected to each and every one of these comments, and the trial court overruled the defense's objections.

After the prosecutor used the term "diversionary" one last time, the defense objected, and the trial court asked the attorneys to approach the bench for a sidebar conference.  During the sidebar conference, the trial court explained that it had overruled the objections because it did not find, after reading the decision in <u>Suggs</u> <u>v. State</u>, 923 So. 2d 419 (Fla. 2005), that use of the word "diversionary" alone was sufficient to violate a defendant's right to a fair trial.  After the prosecutor had already used the term seven times in characterizing the defense case, the trial court finally asked the prosecutor to refrain from using the word because, "taken in an abundance of caution, diversionary is looked upon by some with concern."  The defense counsel requested a curative instruction.  The trial court said it would consider it, but never gave any curative instruction regarding the "diversionary" remarks.

The trial court's reliance on <u>Suggs</u> to overrule the repeated objections to the use of the theme "diversionary tactics" to belittle the defense case was misplaced.  <u>Suggs</u> was a postconviction case involving an ineffective assistance of counsel

claim as to counsel's failure to object to parts of the prosecution's closing argument. The standard in a postconviction case for establishing prejudice in the context of an ineffective assistance of counsel claim, based on the failure to object to closing argument, is entirely different than the standard used in a direct appeal for determining whether the arguments themselves are improper and, if objected-to and overruled, whether they are harmless beyond a reasonable doubt. Further, the defense in <u>Suggs</u> apparently had a tactical reason for not objecting. In that case, this Court merely stated that as long as the prosecutor did not "dwell" upon the improper comments and they were not severely inflammatory or damaging, counsel was not ineffective in failing to object. <u>Id.</u> at 433. Here, in contrast, the prosecutor did "dwell" on them, and the defense counsel did object—repeatedly.

After the trial court asked the prosecutor to refrain from using the word "diversionary," the prosecutor simply used a different expression to denigrate the defense during the State's rebuttal closing argument:

> Prosecutor: You never heard about a lot of people and a lot of things that were said, but you did see a magnificent display here, a real show here—
> Defense Counsel: Objection, denigration of the defense.
> The Court: Overruled.

All of the remarks about the defense using a "diversionary tactic," putting on a "magnificent display," or "cloud[ing]" and "muddl[ing]" the issues are similar to some of the improper comments made by the prosecutor in <u>D'Ambrosio v. State,</u>

- 20 -

736 So. 2d 44, 45 (Fla. 5th DCA 1999), which compelled the Fifth District Court of Appeal to reverse and remand for a new trial. In that case, the Fifth District stated that "[r]epeatedly referring to the defendant's defense as innuendo, speculation and 'a sea of confusion' that defense counsel 'prays you will get lost in' is an improper attack of the defense and defense counsel." Id. at 48. All of these arguments used by the prosecutor in this case were clearly improper, falling well outside the realm of proper trial advocacy. The remarks were not isolated and were repeatedly objected to, and when those objections were overruled, it again stamped the judge's imprimatur of approval on the improper remarks.

The prosecutor also impermissibly denigrated Cardona herself. The prosecutor compared her to a character on a telenovela, which was a racially charged comment that served no purpose other than to ridicule Cardona. Additionally, the prosecutor relied on facts not in evidence, over objection, referring to Cardona's "party days," when "she used to party with her friends;" lived "that high life" and "received a lot of money, a great sum of money from people that owed [Fidel Figueroa] money." None of that information was ever presented to the jury or was part of the evidence in this case. Such comments were improper and only serve to exacerbate the problems inherent in the prosecutor's closing arguments.

## C.  Conclusion Regarding Closing Argument

In this case, the prosecutor repeatedly crossed the line into improper argument, thereby perverting the purpose of closing argument and exceeding the bounds of appropriate advocacy.  The vast majority of the improper comments in this case, including the worst of them—the "justice for Lazaro" and "diversionary" comments that pervaded the prosecutor's argument—were preserved.  Indeed, we have decided that allowing the prosecutor to repeatedly invoke "justice for Lazaro" was in itself not harmless beyond a reasonable doubt, and therefore, a new trial is required.  Our conclusion is further buttressed by the numerous other improper comments that pervaded the State's closing arguments, namely comments that denigrated the defense and Cardona herself.

## II.  Other Issues Raised

We also address certain other issues that are likely to arise on retrial.  Specifically, we consider three other issues—whether the trial court erred in refusing to consider certain IQ tests for purposes of Cardona's intellectual disability claim and the two cross-appeal claims raised by the State related to the penalty phase.

## A.  IQ Tests

Before trial, Cardona filed a motion to determine if she was intellectually disabled, which the trial court denied following an evidentiary hearing.  Cardona

argues that the trial court erred in refusing to consider her IQ scores when addressing her intellectual disability claim. We agree and address the IQ test issue because it will arise if Cardona again raises intellectual disability as a bar to execution and as mitigation.

Prior to this retrial, Cardona alleged that she suffered from an intellectual disability, which would make her ineligible for the death penalty. In order to prove intellectual disability, a defendant must show "significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." Hall v. Florida, 134 S. Ct. 1986, 1994 (2014). A hearing was held prior to the guilt phase, during which numerous psychologists and psychiatrists testified regarding tests they had administered on Cardona. After reviewing all of the evidence, the trial court concluded that there was no clear and convincing evidence that Cardona is intellectually disabled because there was no valid IQ test with a score below 70 and there was no clear and convincing evidence that she has deficits in adaptive functioning.

Three experts tested Cardona's IQ, and all of them attempted to accommodate the fact that Cardona is of Cuban descent, and her primary language is Spanish. One expert examined Cardona in February 1992 and tested her with the Wechsler Adult Intelligence Scale-Revised (WAIS-R) and the Escala de

Inteligencia de Wechsler para Adultos (EIWA), testifying that the difference between these two tests was important because some of the questions are culture-based. When administering the WAIS-R, he translated the WAIS-R into Spanish and then translated Cardona's answers into English, which he recognized compromised the test's validity somewhat. However, according to this expert, in such situations, translating the test in such a manner is an acceptable practice because although a standardized test in the native language of the person being tested is ideal, it is not always possible. A second expert administered the WAIS-III—an IQ test in English—and translated it into Spanish. Cardona received a 61 as her verbal IQ score and a performing IQ score of 68, with a full scale IQ score of 61. Finally, a third expert approached the language problem by administering the WAIS-III performance subtest but not the verbal portion of the IQ test. On the WAIS-III subtest, Cardona obtained a performing IQ score of 72. By the time this third expert evaluated Cardona, the EIWA was too old and was no longer in print.

The trial court denied Cardona's motion because Cardona failed to prove that she has an IQ below 70, and rejected these IQ scores because the experts administered a version of the WAIS by translating the test into Spanish and then translating Cardona's responses into English. The trial court mentioned that it was confined by the Florida Administrative Code, which permits only specific tests, such as the Stanford-Binet Intelligence Scale, the Wechsler Intelligence Scale, and

- 24 -

other valid tests that are administered and interpreted by trained personnel in conformance with the instructions provided by the producer of the test.

To the extent that the trial court's conclusion is based upon a lack of "valid WAIS" scores, the trial court erred. The trial court interpreted the language of the Florida Administrative Code too rigidly and effectively discarded the accommodations made by all of the trained experts to overcome the language barrier because the WAIS and other similar tests were not produced and normed for Spanish-speakers.

The intellectual disability proceedings in this case occurred prior to the Supreme Court's decision in Hall. In Hall, the Supreme Court held that Florida's rigid application of a definition of intellectual disability violated the Constitution because it "disregards established medical practice" by taking an IQ score as "final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence" and by relying on a "purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." Hall, 134 S. Ct. at 1995. The trial court's order in this case suffers from a similar failing because the experts who tested Cardona made accommodations that they considered acceptable in the field in order to provide the best estimate possible as to her IQ, in light of the fact that the tests available to them were not as reliable in this situation.

The trial court did not have the benefit of the <u>Hall</u> decision at the time it made its findings. The experts explained that the accommodations that they made were required because no suitable test was available to Cardona, a Spanish-speaking woman of Cuban descent. Under <u>Hall</u>, the trial court should not have discarded the experts' testing and accommodations based solely on the conclusion that her IQ results were unreliable because they were translated from English.

Therefore, in a subsequent intellectual disability hearing, the trial court should not disregard the IQ tests that the experts deem most accommodating considering the cultural and language issues and should also perform a comprehensive analysis of all three prongs as set forth in <u>Hall</u> and its progeny. <u>See</u> <u>Oats v. State</u>, Fla. L. Weekly S705 (Fla. Dec. 17, 2015).

### B. State's Cross-Appeal Claims

Finally, the State has also raised two arguments on cross-appeal concerning the penalty phase, which we also address because they may become an issue in Cardona's next retrial. First, the State claims that the trial court abused its discretion in refusing to permit its mitigation rebuttal expert witness to testify during the penalty phase. We agree. This was error because the State adequately proffered and was entitled to present its expert's testimony for the limited purpose of rebutting testimony of Cardona's expert witness as to her mental state. To the extent the trial court excluded it on the grounds that it would violate Cardona's

Fifth Amendment rights, it was an abuse of discretion. See Buchanan v. Kentucky, 483 U.S. 402, 423-24 (1987) (stating that the State may introduce the results of a court-ordered mental health examination for the limited purpose of rebutting a mental-status defense); see also Kansas v. Cheever, 134 S. Ct. 596, 601 (2013) (clarifying that Buchanan is applicable where the defendant presented psychiatric evidence, and is not limited to where the mental state issue is raised as an affirmative defense).

The other cross-appeal issue that we address is the State's claim that the trial court abused its discretion in instructing the jury on and finding the "no significant criminal history" mitigator without giving the State the opportunity to introduce evidence to rebut the "no significant criminal history" mitigator. We likewise agree because Cardona did not assert this mitigator until after the presentation of evidence had concluded, and by making that assertion, she opened the door to allow the State to rebut it, so the State should not have been denied the opportunity to do so.

Thus, we conclude that with respect to both cross-appeal claims raised by the State, the trial court erred.

## CONCLUSION

Based upon the prosecutor's improper comments that permeated the State's closing argument, which repeatedly invoked "justice for Lazaro" and appealed to

the passions of the jury, the "over zealousness in prosecuting the State's cause actually worked against justice, rather than for it." Gore, 719 So. 2d at 1203. Accordingly, we are compelled to vacate Cardona's convictions and death sentence and remand for a new trial.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
LEWIS and CANADY, JJ., concur in result.
POLSTON, J., dissents.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Miami-Dade County,
        Reemberto Diaz, Judge - Case No. 131990CF048092B000XX

Carlos Jesus Martinez, Public Defender, and Andrew McBride Stanton, Assistant Public Defender, Eleventh Judicial Circuit, Miami, Florida,

        for Appellant/Cross-Appellee

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Sandra Sue Jaggard, Assistant Attorney General, Miami, Florida,

        for Appellee/Cross-Appellant