# Supreme Court of Florida

_____

No. SC2022-1553
_____

**ALLEN WARD COX,**
Appellant/Cross-Appellee,

vs.

**STATE OF FLORIDA,**
Appellee/Cross-Appellant.

July 11, 2024

SASSO, J.

Allen Ward Cox appeals a sentence of death imposed during a resentencing that this Court ordered as a result of *Hurst* error.[1] For the reasons that follow, we affirm.

## I.

Cox, then an inmate in Lake Correctional Institute ("LCI"), was indicted in 1999 for the premeditated murder of fellow inmate Thomas Baker. The charges against Cox resulted from a chain of events within LCI that culminated in the death of Baker and an

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

assault upon Lawrence Wood. We described the evidence presented at Cox's guilt phase trial in *Cox v. State*, 819 So. 2d 705 (Fla. 2002), as follows:

> At trial, the State presented the testimony of numerous corrections officers and inmates regarding the circumstances surrounding the murder of Baker, who was also a LCI inmate. On December 20, 1998, the appellant discovered that someone had broken into his personal footlocker and stolen approximately $500. Upon making this discovery, Cox walked out onto the balcony of his dorm and announced that he would give fifty dollars to anyone willing to identify the thief. He also indicated that when he discovered who had stolen from him, he would stab and kill that person, and that he did not care about the consequences.
>
> During the prison's lunch period on December 21, the appellant called Baker over to him, and then hit him with his fists to knock him down. During the attack, the victim continuously attempted to break free from Cox, and also denied stealing from him multiple times. At a lull in the beating, the appellant said, "This ain't good enough," and stabbed Baker with an icepick-shaped shank three times. After the stabbing, Appellant walked away stating, "It ain't over, I've got one more . . . to get." He then walked behind the prison pump house and hid the shiv in a pipe. Cox proceeded from the pump house to his dorm, where he encountered Donny Cox (unrelated to the appellant). There, Appellant questioned him about his stolen money and told him that if Cox had his money, he would kill him also. Following this exchange, the appellant returned to his cell, where he next attacked his cellmate, Lawrence Wood, advising him that Wood was "lucky I put it up, or I'd get [you]."
>
> While the appellant was returning to his cell, the stabbing victim fled the attack scene and ran to corrections officers in a nearby building. The officers

- 2 -

present at the time testified at trial that Baker had blood coming from his mouth, and that he was hysterically complaining that his lungs were filling with blood. Baker also responded to the prison officials' questions regarding who had attacked him by saying, "Big Al, Echo dorm, quad three." Although the corrections officers attempted to expedite emergency treatment of the victim by placing him on a stretcher and carrying him on foot to the prison medical center, Baker died before arriving at the hospital.

Doctor Janet Pillow testified that upon her autopsy of the victim, she found that the victim had been stabbed three times. Two of the wounds inflicted were shallow punctures of the lower torso, but the fatal wound had entered the victim's back and traveled through the chest cavity, between two ribs, and finally pierced the lungs and aorta. She testified that a conscious person with this wound would suffer from "air hunger," and would be aware of the "serious danger of dying." She described the wound as being approximately 17.5 centimeters deep, although only two millimeters wide. Doctor Pillow verified that the shank found by the pump house was consistent with the victim's injuries, despite the fact that the wound was deeper than the length of the weapon. She attributed the discrepancy between the length of the weapon and the depth of the wound to the elasticity of human tissue.

The appellant also testified, contending that all of the previous witnesses were correct, except that they had not seen what truly happened when he, Baker, and Vincent Maynard, a third inmate, were close together. According to Cox, it was he who had in fact dodged Baker and Maynard's attempts to stab him, and it was Maynard who actually stabbed Baker in the back accidentally. In Cox's version of the events, he had only struck the victim because he was defending himself from both of the other attacking men.

*Id.* at 709-10 (alteration in original) (footnote omitted). The jury found Cox guilty of first-degree murder, and the trial court sentenced him to death. *Id.* at 710. In 2002, we affirmed his conviction and death sentence. *Id.* at 725.

After exhausting his initial state and federal postconviction proceedings, Cox filed a second successive motion for postconviction relief based on *Hurst v. Florida.*[2] In 2017, the circuit court granted his motion, vacated his sentence, and ordered a new penalty phase.

At the conclusion of his new penalty phase trial, the jury voted unanimously to recommend that Cox be sentenced to death. In doing so, the jury found the State proved two aggravators beyond a reasonable doubt: imprisonment and a prior violent felony. The jury further found that the aggravating circumstances outweighed the mitigating circumstances.

Cox waived his right to a *Spencer*[3] hearing. On October 24, 2022, after reviewing both the State and defense sentencing memorandums, the trial court sentenced Cox to death. The trial

---

2. *Hurst v. Florida,* 577 U.S. 92 (2016).

3. *Spencer v. State,* 615 So. 2d 688 (Fla. 1993).

- 4 -

court contemporaneously issued a written sentencing order detailing its consideration of both the aggravating and mitigating factors at issue.

In its order, the trial court found that both aggravating factors had been established beyond any doubt, and that 57 nonstatutory mitigating factors had been established and were entitled to weight.[4]  However, because it determined the mitigating

---

4.  As to nonstatutory factors, the trial court gave weight to 57, identified in its sentencing order by alphabetical markers: (b) Cox has a genetic predisposition for substance abuse/addiction—minimal weight; (c) Cox has suffered from substance abuse/addiction throughout his life—minimal weight; (d) Cox started drinking alcohol at age 13—some weight; (e) Cox started smoking marijuana at age 13—some weight; (f) Cox started drinking heavily at age 16—some weight; (h) Cox has consumed many different drugs throughout his life—minimal weight; (i) Cox suffers from a genetic mutation/abnormality—little weight due to the uncertain significance of the genetic mutation; (k) Cox suffered head injuries as a child—some weight; (l) Cox has brain damage—very little weight; (m) Cox has suffered with emotional dysregulation throughout his life—little weight; (n) Cox has suffered from behavioral problems throughout his life—little weight; (o) Cox suffers from Major Depressive Disorder—some weight; (p) Cox suffers Dysthymia (Persistent Depressive Disorder)—little weight; (q) Cox suffered from anxiety throughout his life—little weight; (u) Cox has suffered from depression throughout his life—minimal weight; (v) Cox suffers from impulse control deficits which have negatively affected his behavior from childhood through adulthood—no weight; (x) Cox had academic problems—no weight; (y) Cox was raised in poverty—little weight; (z) Cox was raised in a log cabin with no running water, electricity, or indoor plumbing—little weight; (bb)

Cox suffered from lack of clothing, shoes, and poor hygiene while growing up—little weight; (dd) Cox was physically abused by his father, Ray Cox—slight weight; (ee) Cox was emotionally neglected by his father—some weight; (ff) Cox's father was an alcoholic—slight weight; (gg) Cox's father was violent throughout his childhood—little weight; (hh) Cox was physically abused by his mother, Barbara Jean Edelen—some weight; (ii) Cox was physically abused by his mother the most out of all of his siblings because he reminded her of his father—some weight; (kk) Cox was emotionally abused by his mother—some weight; (ll) Cox was emotionally neglected by his mother—some weight; (mm) Cox's mother was very violent throughout his childhood—some weight; (nn) Cox's mother suffered from depression—slight weight; (oo) Cox's mother had a nervous breakdown when he was a young child—little weight; (pp) Cox's parents are biologically related—no weight; (qq) Cox's parents were very young when he was born—minimal weight; (rr) Cox witnessed his father abusing his mother—little weight; (tt) Cox witnessed domestic violence in the household between his father and stepmother, Betty Gilbert—little weight; (uu) Cox attempted to protect his mother from his father—slight weight; (xx) Cox was never taught right from wrong—no weight; (yy) Cox withdrew from high school in the tenth grade—no weight; (zz) Cox was abandoned by his mother at age 10 when she dropped him off at his father's house and threatened to kill him if he returned—some weight; (bbb) Cox, though incarcerated, is a positive influence on his sister, Cathy Null—slight weight; (ccc) Cox is a loving brother to his sister, Elizabeth Veatch—slight weight; (ddd) Cox is a loving brother to his sister, Cathy Null—slight weight; (eee) Cox's life has a deep and profound meaning to his sister, Elizabeth Veatch—slight weight; (fff) Cox's life has a deep and profound meaning to his sister, Cathy Null—slight weight; (ggg) Cox has been suicidal from childhood through adulthood—some weight; (iii) Cox has attempted suicide many times throughout his life—some weight; (jjj) Cox's first suicide attempt was at age 16 by eating rat poison—little weight; (kkk) Cox was hospitalized after his first suicide attempt—no weight; (lll) Cox almost died from a suicide attempt in 2010—little weight; (ppp) Cox suffers from a low average IQ and memory deficits—slight weight because Cox conducted an elaborate marijuana and stamp

circumstances were outweighed by the two significant aggravating circumstances, the trial court sentenced Cox to death for the murder of Baker.

Cox appeals that determination, raising seven issues: (1) the trial court erred in rejecting the nonstatutory mitigating circumstance that Cox suffers from the early signs of dementia, (2) the trial court erred in rejecting two of the proposed nonstatutory mitigators, (3) the cumulative effect of the prosecutor's comments during closing was so prejudicial as to taint the jury's recommended sentence, (4) the trial court erroneously placed the burden of showing mitigating circumstances on the defendant, (5) executing an offender with brain damage violates the Eighth

business while incarcerated; (rrr) Cox suffers from an array of physical illnesses as a result of aging—little weight; (sss) Cox had no protective factors growing up—some weight; (ttt) Cox's parents divorced twice while he was young—very little weight; (uuu) Cox has suffered multiple Adverse Childhood Experiences based on the CDC Adverse Childhood Experiences Study—slight weight; (vvv) Cox suffers from impairments to his executive functioning—some weight; (www) Cox's genetic makeup has been changed due to the toxic environment he grew up in (epigenetics)—slight weight because Cox refused to take part in therapy to potentially overcome his environmental history; and (xxx) Cox has never received the type of treatment needed in order to address the ramifications of his turbulent and traumatic childhood—no weight because Cox was unwilling to take part in offered treatment.

Amendment, (6) Florida's capital punishment scheme violates the Eighth Amendment, and (7) the death penalty itself violates the Eighth Amendment. The State filed a cross-appeal, which presents a single issue.

We address each issue raised by Cox in turn.

## II.

## A.

Cox's first two arguments on appeal concern the trial court's rejection of certain nonstatutory mitigating factors proposed by Cox. In evaluating mitigating circumstances, a trial court must find as mitigating "each proposed factor that has been established by the greater weight of the evidence and that is truly mitigating in nature." *Ault v. State*, 53 So. 3d 175, 186 (Fla. 2010) (quoting *Coday v. State*, 946 So. 2d 988, 1003 (Fla. 2006)). And in its written sentencing order, the trial court must expressly evaluate each statutory and nonstatutory mitigating circumstance proposed by the defendant. *Id.*; *see also Smiley v. State*, 295 So. 3d 156, 176-77 (Fla. 2020) (providing that a "trial court may comply with this requirement by bundling proposed mitigating circumstances into categories of related conduct or issues and addressing them

accordingly"). "However, a trial court may reject a proposed mitigator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection." *Ault*, 53 So. 3d at 186 (quoting *Coday*, 946 So. 2d at 1003). And "[e]ven expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case." *Id.* (quoting *Coday*, 946 So. 2d at 1003).

We review a court's decision as to whether a mitigating circumstance is established for abuse of discretion. *See Foster v. State*, 679 So. 2d 747, 755 (Fla. 1996); *Harris v. State*, 843 So. 2d 856, 868 (Fla. 2003). In doing so, we will uphold the trial court's findings where there is competent, substantial evidence in the record to support each finding. *See Lebron v. State*, 982 So. 2d 649, 660 (Fla. 2008).

**1.**

Cox first argues that the trial court erred in rejecting the nonstatutory mitigating circumstance that Cox suffers from the early signs of dementia. Specifically, Cox argues that the

nonstatutory mitigator was definitively established by the expert testimony of Dr. Mark Rubino.[5]  We disagree.

At resentencing, Dr. Rubino testified that dementia is a term for cognitive impairments that cause functional impairment, but dementia can be static and/or progressive.  He explained that static dementia refers to severe brain damage, while progressive dementia refers to progressive diseases like Alzheimer's disease.  Noting this distinction in its sentencing order, the trial court explained that Dr. Rubino recognized that Cox has dementia, but Dr. Rubino could not say that Cox's dementia is progressive in nature.  As a result, the trial court determined there was no evidence that Cox suffered from the early signs of progressive, rather than static, dementia.

We conclude that the trial court acted within its discretion, both in characterizing the proposed mitigator as one directed at progressive versus static dementia, and in concluding that Cox did

---

5.  To the extent Cox argues that the trial court did not expressly evaluate whether static dementia is present, his argument does not demonstrate error.  In context, the sentencing order conveys that the trial court considered Dr. Rubino's opinion (that Cox likely has static dementia caused by head trauma, consistent with a decline in neurocognitive abilities).  However, because the testimony did not conclusively establish progressive dementia, the trial court therefore rejected the nonstatutory mitigator of "early signs of dementia," which implies progressive dementia.

not establish the mitigator by the greater weight of the evidence. *See, e.g., Ault*, 53 So. 3d at 188 (affirming the trial court's decision to reject certain statutory mitigating circumstances where the trial court considered all evidence relating to the proposed statutory mitigating circumstances and properly exercised its discretion in rejecting it). Indeed, Dr. Rubino's testimony on this point was equivocal at best, as he expressly stated that he "[did not] know if it's progressive or static." As a result, we find no error in the trial court's rejection of this nonstatutory mitigator.

**2.**

Cox similarly argues that the trial court erred in rejecting the proposed nonstatutory mitigators that (1) Cox suffers from impulse control deficits which have negatively affected his behavior from childhood through adulthood, and (2) Cox had stopped taking his anti-depressant, Sinequan, 17 days before the murder, and the withdrawal impacted his behavior at the time of the crime. As to both of these proposed mitigating circumstances, Cox argues that the trial court's findings are not supported by competent, substantial evidence. Again, we disagree.

- 11 -

As to impulse control, the trial court addressed the various expert testimony that linked Cox's brain functionality to impulse control deficits. However, the trial court then outlined Cox's actions leading up to the murder, concluding his actions demonstrated he could control his impulses. The trial court therefore determined that while Cox had established he suffered from impulse control deficits throughout his life, the circumstance was not mitigating under the facts of this case.

The trial court's determination is supported by competent, substantial evidence.[6] *See Newberry v. State*, 288 So. 3d 1040, 1049 (Fla. 2019) (holding that trial court did not err in determining certain mitigating circumstances were established but not mitigating based on defendant's purposeful actions during and after the crime); *Gill v. State*, 14 So. 3d 946, 964 (Fla. 2009) (trial court did not abuse its discretion in giving little weight to impulse control

6. Because we agree that the trial court's rejection of the impulse control mitigator was primarily based on its conclusion that the circumstances leading up to the murder demonstrated that Cox did not suffer from lack of impulse control, we likewise reject Cox's arguments related to deficiencies in Dr. Emily Lazarou's testimony offered by the State. However, we also note that Cox did not raise any objections to Dr. Lazarou's testimony on this point, and thus any argument related to her testimony is unpreserved for appeal.

as a mitigator when the murder was "neither impulsive nor due to uncontrollable rage"). Cox made statements to others that he did not care about the consequences for killing the person responsible for stealing money from him. He obtained a shank and concealed it. Cox also beat the victim before announcing "that's not good enough," and stabbing him three times. After the murder, Cox hid the shank and returned to his cell, where he attacked his cellmate as well. The trial court therefore acted within its discretion when it concluded that Cox's impulse control deficits are not a mitigating factor.

As to his proposed mitigator regarding the discontinuation of Sinequan, Cox argues that the trial court erred in rejecting the testimony presented by defense experts in favor of Dr. Lazarou, an expert offered by the State. Specifically, Cox argues that Dr. Lazarou's testimony relating to Cox's Sinequan use extended beyond the scope of her expertise and therefore did not amount to competent, substantial evidence.

We reject Cox's argument. First, defense counsel raised no objection that Dr. Lazarou's opinions were outside her area of expertise and therefore Cox's arguments are unpreserved for

appeal.  And regardless, the trial court's determination is supported by competent, substantial evidence.

Testimony was presented by multiple experts: Dr. Rubino, Dr. Susan Skolly-Danziger, Ms. Helen Zarvatski, and Dr. Lazarou. Dr. Skolly-Danziger testified that discontinuation symptoms could include agitation and that it would take 18 days for the drug to leave someone's system.  Dr. Rubino testified that Cox could have been "potentially like a powder keg."  But, in contrast, Dr. Lazarou testified that Cox would not feel any impacts after five days of terminating use of the drug, and Ms. Zarvatski (a psychological specialist at LCI who met with inmates on her caseload for mental health counseling) testified that she met with Cox three days before the murder and saw no signs of mental health distress. Additionally, Cox's cellmate, Lawrence Wood, testified that in the weeks leading up to the murder, he saw no indication that Cox was using drugs, alcohol, or other substances, and that he had no mood changes in the days leading up to the murder.  From this testimony, the trial court properly concluded that Cox was not

suffering from withdrawal or discontinuation symptoms.[7] *See, e.g.,*
*Ault*, 53 So. 3d at 187-88 (concluding trial court properly exercised
its discretion in evaluating the evidence relied upon by each expert
and determining that one expert's opinion was more reliable and
credible).

Accordingly, the trial court did not err when it rejected Cox's
proposed mitigating circumstances related to his impulse control
and Sinequan use.

**B.**

In his third point on appeal, Cox argues that the cumulative
effect of the prosecutor's improper comments during the penalty
phase closing was so prejudicial as to taint the jury's recommended
sentence. Because defense counsel did not object during the
closing argument, Cox argues fundamental error. Fundamental
error is error that reaches "down into the validity of the trial itself to

---

7. Cox alternatively argues that the trial court relied in error
on "the prosecutor's confident assertion" regarding anti-depressant
discontinuation syndrome. However, the trial court's discussion of
this issue analyzed the varying expert opinions and explained why
Dr. Skolly-Danziger's opinion was inconsistent with observations of
Cox by both Ms. Zarvatski and his cellmate, and was likewise
inconsistent with Cox's actions the day of the murder. Cox has not
demonstrated error on this point.

the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *State v. Delva*, 575 So. 2d 643, 644-45 (Fla. 1991) (quoting *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)).

At closing, the prosecutor made the following comments:

> When Mr. Lewis began his opening statement last week, he did not start by saying good morning to you. And he didn't do that because it's never a good morning when the State has to stand in front of jurors and ask those jurors to recommend to this Judge to sentence a fellow citizen to death. Sometimes people are required to make very difficult choices, and though a choice may be hard, it's still the right choice.

Continuing on, the prosecutor also said:

> The easiest decision in this case to make would be, let's just give him life and let's just go home. But ask yourself, is that justice based on the facts and circumstances of this case? Is that justice for Thomas Baker? Is that justice for a man who has intentionally hurt people over and over and over again throughout his life? Sometimes the right decision is not the easy one.

Cox argues these comments rose to the level of fundamental error for three reasons. First, he cites cases condemning arguments that included demands for justice for victims. *See, e.g.*, *Cardona v. State*, 185 So. 3d 514, 522 (Fla. 2016) (citing *Davis v. State*, 136 So. 3d 1169, 1197 (Fla. 2014), which held that "the argument that the victim's siblings would want to know what

- 16 -

justice was imposed for the victim's murder was improper").

Second, Cox argues it is improper to poison the well of deliberation by suggesting that any juror who would vote for life is motivated by a desire to make "the eas[y] decision" and to "just go home." *See United States v. Young*, 470 U.S. 1, 18 (1985) (holding that an exhortation to the jury to "do its job" was not permitted, as "that kind of pressure . . . has no place in the administration of criminal justice"). Third, Cox argues these errors were compounded by the prosecutor's invocation of the theme presented in the first error discussed.

We find that the authorities on which Cox bases his arguments are either distinguishable or do not support his claim of fundamental error.[8] Take, for example, *Cardona.* There, the

---

8. Neither *United States v. Mandelbaum*, 803 F.2d 42, 46 (1st Cir. 1986); *Young*, 470 U.S. at 16; *Shaara v. State*, 581 So. 2d 1339, 1341 (Fla. 1st DCA 1991); nor *Dorsey v. State*, 942 So. 2d 983, 986 (Fla. 5th DCA 2006), support Cox's argument. While those cases recognized the impropriety of certain arguments, each of the courts concluded any error presented by the prosecutor's argument did not constitute a basis for reversal. And *Edwards v. State*, 428 So. 2d 357, 359 (Fla. 3d DCA 1983), is distinguishable because the defense counsel there made a timely objection to the argument that was immediately overruled by the court without comment, which ruling the Third District Court of Appeal concluded stamped

prosecutor's closing argument included recurring "justice for Lazaro"[9] comments, which were made repeatedly and despite a sustained objection from defense counsel. On review, we noted that the comments "pervaded the prosecutor's closing argument" and were "further buttresse[d]" by "[t]he existence of additional improper remarks—most of which were also preserved but some of which were not." *Cardona*, 185 So. 3d at 523. To compound the problem, the prosecutor "attempted to shift the burden of proof beyond a reasonable doubt by urging the jury to convict Cardona based on what was 'true' and linked 'justice for Lazaro' with the 'truth.'" *Id.* Finally, "no curative instruction was ever given as to the 'justice for Lazaro' comments." *Id.*

In this case, though, the focus of the prosecutor's remarks was on the responsibility of the jury to weigh the relevant factors, and the prosecutor did not invoke a direct, unambiguous appeal for the jurors to give weight to the fact that the State had decided to seek

---

approval on the argument, thereby aggravating the prejudicial effect.

9. In that case, Lazaro was the deceased, a three-year-old child whose death was the subject of the widely publicized "Baby Lollipops" case. *Cardona*, 185 So. 3d at 517.

- 18 -

the death penalty. No objections were made by defense counsel during the comments. And the prosecutor's entire closing argument, again read in context, shows that the prosecutor did not dwell on justice for the victim as a theme for the case.

As a result, this case is more like *Williams v. State*, 209 So. 3d 543 (Fla. 2017). In *Williams*, the defendant alleged two instances of improper comments made by the prosecutor, one of which took place during guilt phase closing arguments. *Id.* at 561. Williams, appearing pro se, did not object to either set of comments. *Id.* We therefore considered whether the comments constituted fundamental error, either individually or cumulatively, and held that they did not. We reasoned that the comments "were a small number of improper remarks made during the course of the entire guilt phase" and that, especially given the substantial evidence that supported a conviction, "the cumulative effect of these improper comments was not so prejudicial that it vitiated the entire trial." *Id.* at 563.

Here, as in *Williams*, the defense did not make any contemporaneous objections to the prosecutor's comments. And in context, the small number of improper remarks made during the

trial were not so prejudicial as to call into question the jury's verdict. We therefore conclude Cox has not demonstrated fundamental error.

## C.

Cox's final four points on appeal constitute unpreserved and purely legal arguments, primarily related to the constitutionality of Florida's death penalty scheme. We reject each argument based on the application of established precedent. Our review of each issue is de novo. *State v. Floyd*, 186 So. 3d 1013, 1019 (Fla. 2016).

First, Cox argues that the trial court erred in placing the burden of demonstrating mitigating circumstances on the defense when it presented to the jury the standard jury instruction relating to mitigation.[10] However, as Cox recognizes, this argument is

---

10. The jury instruction at issue stated that:

    A mitigating circumstance need not be proven beyond a reasonable doubt by the defendant. A mitigating circumstance need only be proven by the greater weight of the evidence, which means evidence that more likely than not tends to prove the existence of a mitigating circumstance. If you determine by the greater weight of the evidence that a mitigating circumstance exists, you may consider it established and give that evidence such weight as you determine it should receive

- 20 -

foreclosed by *Loyd v. State*, 379 So. 3d 1080, 1092 (Fla. 2023), *reh'g denied*, SC2022-0378 (Fla. Feb. 7, 2024). Like the argument presented by Loyd, Cox's argument in this regard is meritless, and we reject the claim.

Next, Cox argues that the execution of certain defendants with brain damage violates the Eighth Amendment to the Federal Constitution. He contends that those with intellectual disabilities are ineligible for the death penalty, as in *Atkins v. Virginia*, 536 U.S. 304 (2002), and that juveniles are ineligible for the death penalty, as in *Roper v. Simmons*, 543 U.S. 551 (2005). Similarly, he argues, offenders with brain damage should be ineligible as well.

However, we have consistently rejected these arguments. *See Carroll v. State*, 114 So. 3d 883, 886-87 (Fla. 2013) (rejecting claim that mental illness bars execution and citing numerous prior cases); *Simmons v. State*, 105 So. 3d 475, 510-11 (Fla. 2012) (rejecting claim that persons with mental illness must be treated similarly to those with mental retardation due to reduced culpability); *Barwick v. State*, 88 So. 3d 85, 106 (Fla. 2011)

in reaching your conclusion as to the sentence to be imposed.

- 21 -

(rejecting "the argument that *Roper* extends beyond the Supreme Court's pronouncement that the execution of an individual who was younger than eighteen at the time of the murder violates the eighth amendment"); *Johnston v. State*, 27 So. 3d 11, 26 (Fla. 2010) (rejecting claim that mentally ill persons are similar to and should be treated the same as juvenile murderers who are exempt from execution); *Lawrence v. State*, 969 So. 2d 294, 300 n.9 (Fla. 2007) (rejecting claim that "the Equal Protection Clause requires this Court to extend *Atkins* to the mentally ill"); *Connor v. State*, 979 So. 2d 852, 867 (Fla. 2007) ("To the extent that Connor is arguing that he cannot be executed because of mental conditions that are not insanity or mental retardation, the issue has been resolved adversely to his position."). Cox has not presented any reason for this Court to reconsider its precedent on this issue. We therefore reject Cox's argument.

Third, Cox argues that Florida's death penalty scheme risks the arbitrary and capricious application of the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Again, Cox's arguments on this point are well-worn, and this Court has repeatedly rejected them. *See Wells v.*

*State*, 364 So. 3d 1005, 1015-16 (Fla. 2023) (rejecting facial overbreadth challenge due to alleged failure to narrow the class eligible for the death penalty); *Joseph v. State*, 336 So. 3d 218, 227 n.5 (Fla. 2022) (rejecting arguments that there was insufficient evidence to support the cold, calculated, and premeditated aggravator); *Colley v. State*, 310 So. 3d 2, 15-16 (Fla. 2020) (rejecting argument that Florida has an overprovision of aggravating factors); *Bush v. State*, 295 So. 3d 179, 214 (Fla. 2020) (rejecting argument that there was insufficient evidence to support the prior violent felony aggravator and the CCP aggravator). Likewise, we reject Cox's argument on this point.

Finally, Cox argues that the death penalty categorically violates the Eighth Amendment of the United States Constitution given evolving standards of human decency. Specifically, he claims that the death penalty (1) is no longer compatible with evolving standards of decency, (2) is unreliable based on the number of exonerations in capital cases, (3) is arbitrarily applied depending on geography, and (4) is unconstitutionally cruel based on lengthy delays between imposition and execution of the sentence.

Each of these four sub-arguments was raised in *Loyd*, 379 So. 3d at 1096-97. This Court rejected all four. *Id.* (denying Loyd's four arguments as to why the death penalty violates the Eighth Amendment after concluding that none are convincing). Again, Cox has not presented any reason for this Court to reconsider its established precedent on this issue. We therefore reject Cox's argument in this regard.

**III.**

In conclusion, Cox has not demonstrated reversible error. We therefore affirm his death sentence. And because we affirm, we do not address the issue raised by the State on cross-appeal. *See, e.g.*, *Deparvine v. State*, 995 So. 2d 351, 361 n.4 (Fla. 2008) ("The State raises two cross-appeal issues, which we will not address because Deparvine's convictions and sentences are affirmed."); *Hoskins v. State*, 965 So. 2d 1, 7 (Fla. 2007) ("Because we affirm, we do not address the State's cross-appeal.").

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, and FRANCIS, JJ., concur.
LABARGA, J., concurs in result with an opinion.

- 24 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

For the reasons set forth in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), wherein this Court abandoned its decades-long practice of conducting comparative proportionality review in death penalty direct appeal cases, I can only concur in the result.

An Appeal from the Circuit Court in and for Lake County,
    James R. Baxley, Judge
    Case No. 351999CF000249AXXXXX

Matthew J. Metz, Public Defender, and Nancy Ryan and Robert J. Pearce III, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant/Cross-Appellee

Ashley Moody, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee/Cross-Appellant