# Supreme Court of Florida

_____

No. SC14-1514
_____

**QUENTIN MARCUS TRUEHILL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[February 23, 2017]

PER CURIAM.

Truehill appeals his convictions for the murder and kidnapping of Vincent Binder and his death sentence. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Truehill's convictions and the death sentence.

## FACTS

Quentin Truehill, who was twenty-two years old at the time, was charged with the kidnapping and murder of Vincent Binder, who was twenty-nine years old. Truehill's crime spree began on the evening of March 30, 2010, at the Avoyelles Parish Sheriff's Office in Mansura, Louisiana, when Truehill and two

other cellmates, Kentrell F. Johnson[1] and Peter Hughes,[2] held the holding-cell officer hostage. Truehill then attacked the booking officer with a shank, after which the three cellmates fled the jail. Later that day, the men stole a black Chevy extended-cab truck, which contained tools, including saws and knives. The truck was eventually found in Miami, and a search of the truck led to the murder weapon and other relevant physical evidence.

Truehill, Johnson, and Hughes committed a series of crimes between Louisiana and Florida as they made their way to Miami, which were all linked to the actual murder. In Broussard, Louisiana, in the parking lot of a shopping center, the men stole a purse from LeAnn Williams as she exited her car. They then used Williams' credit cards from her purse to fund their journey until her credit card company listed the card as stolen. A video from the shopping center showed images of the black Chevy truck backing into a parking spot near the incident. Williams' identification card was later found in the stolen truck.

---

1. Codefendant Kentrell Johnson was tried separately, found guilty and sentenced to death for the murder of victim Binder, and his conviction and death sentence for that murder is on appeal and still pending in this Court. Johnson v. State, No. SC14-1966 (remanded for evidentiary hearing Sept. 29, 2016).

2. Codefendant Peter Hughes was charged with the same crimes, pled guilty to first-degree murder, and was sentenced to life imprisonment without the possibility of parole.

On the afternoon of April 1, 2010, in Pensacola, Florida, the three men attacked Brenda Brown at an apartment complex. One of the men had initially approached her, asking for some water, and the three men followed her into an apartment that she was cleaning. After Brown filled a blue plastic cup with water, two of the men brandished large knives and demanded her money. One man displayed a large filleting knife, while the other man's knife was twelve inches in length with a brown wooden handle and did not have a point at the end. Brown gave them her money, at which point they taped her mouth with electrical tape, taped her hands behind her back, and took her to a back bedroom, where they hit her on her head with the knives. Brown put her hands up to protect herself and then pretended to be dead. Based on the injuries she sustained in the attack, she had five of her fingers amputated; she also had a skull fracture and two lacerations on her head. Brown identified Truehill as the person who approached her with the knife. After Truehill was apprehended, police found a pair of jeans in the codefendants' motel room with both Binder's and Brown's DNA on it, establishing that the person who battered Brown was also involved in Binder's death.

The codefendants continued east, arriving in Tallahassee that same day. At 10:30 p.m. on April 1, Johnson approached Mario Rios, who was visiting a friend at an apartment complex in Tallahassee, to ask Rios if the mall was still open. The question seemed odd since it was so late, and Rios began backing away from

Johnson. Truehill, at that point, jumped out and grabbed Rios by his shirt with a twisting motion, demanding all of Rios's possessions as Truehill displayed a large knife. Rios identified the knife in evidence as being consistent with the knife that he saw. Rios pushed Truehill back and ran to his friend's apartment. He called the police immediately and gave law enforcement the shirt that Truehill grabbed. DNA testing on the portion of the shirt that Truehill grabbed was consistent with Truehill's DNA.

Later that same evening, around 11 p.m., Cris Pavlish and her friend were walking in a parking lot toward her car when a black four-door truck quickly approached and stopped in a manner that blocked them. The men in the truck asked them for directions, and Pavlish and her friend attempted to answer their questions. At that point, Truehill demanded her purse, swinging a machete with a wooden handle and a thin, gold band across it. Truehill initially attempted to grab Pavlish, but she was able to break free from his grip. During the scuffle, Pavlish's purse fell, so Truehill put the knife down to grab her purse. Pavlish used the opportunity to run away, and her friend followed shortly. Some of the personal items that Pavlish had in her purse were found in the stolen black truck.

That same evening, on April 1, Beth Frady, her husband David, and Rebecca Edwards met Vincent Binder for dinner in Tallahassee and then ended their evening at the Fradys' home, where Edwards and Beth Frady worked on a paper

for school.  Binder had his bankcard with him earlier that evening when he made a purchase at a gas station.  Around midnight on April 2, Binder left the study group to walk home since he lived only about a mile away.  The next day, Beth Frady texted Binder numerous times, attempted to call him, and stopped by his house, but he never responded to any of the attempts.  On April 8, she reported Binder as missing to the police, and during their investigation, the police learned that Binder's bankcard was used for two transactions that occurred at 12:15 and 12:21 a.m. at the Halftime Keg store in Tallahassee on April 2—fifteen minutes after Binder had left his friends' home.  A video was obtained from the store, which showed Truehill using the victim's bankcard without the victim's presence.  Additional transactions occurred with his bankcard in Madison County, Jacksonville, Fort Pierce, Daytona Beach, Opa Locka, and Miami, at which point the bankcard was blocked based on suspicious activity.

Shirley Marcus met Truehill, Johnson, and Hughes in Miami that month when the three men and her friend, Tony, picked her up in the four-door black truck.  Marcus, who partied with the group at a hotel, recalled that the three men "had money."  The next day, Marcus joined the codefendants to eat at Burger King and visit the beach.  While at the beach, however, one of the men lost the keys to the truck.  Marcus and Johnson left to retrieve Marcus's vehicle—a red Ford Sport Trac.  When they returned to pick up Truehill and Hughes, Truehill and Hughes

had Marcus's tennis shoes, even though she had left them in the locked, black truck. In addition, the men carried a large, black bag. Police eventually recovered the black truck at the beach in Miami with a shattered left rear window.

Shortly after this, the men had run out of money, so Marcus took the three men to her house. Marcus drove Truehill, Johnson, and Hughes to a local Wachovia bank, where they attempted to withdraw $1,300 from Binder's bank account, using Binder's bankcard and driver's license that Truehill had with him. The bank teller became suspicious because, while the driver's license submitted belonged to a white male, the driver was a black female, and all of the passengers were black males. After the teller took a long time in processing the request, Johnson told Marcus to drive away. A bank security guard was able to write down Marcus's tag number before the vehicle disappeared, and a surveillance camera captured images of the vehicle.

Meanwhile, Peter Milian of the Miami-Dade Police Department noticed a black truck in a parking lot with a shattered left rear window and a missing license tag. After learning the vehicle was reported as stolen from Louisiana and searching the vehicle, he found a bloody knife underneath the front passenger seat. Subsequent testing of the knife revealed that eight of the bloodstains contained a complete DNA profile that matched Binder, and Johnson was found to be a minor contributor. Additional items were later found in the truck, including Williams'

Louisiana identification card, ATM receipts, Pavlish's documents, and a green washcloth with blood on it. DNA testing of the washcloth revealed a blood stain that contained a complete DNA profile that matched Binder, and a mixed DNA profile that was consistent with Binder and Johnson.

On April 12, 2010, Marcus, Truehill, and Hughes were arrested at a Budget Inn Motel, and Johnson was arrested a block away shortly after. In the motel room shared by Marcus, Truehill, Hughes, and Johnson, police found significant incriminating evidence, including Binder's wallet, a black, heavy-duty garbage bag containing clothing, a metal handsaw, a machete, and a pair of black Levi's jeans. DNA testing on the machete resulted in a partial DNA profile that matched Truehill. DNA testing on the black Levi's revealed mixed DNA profiles, where Binder was the major contributor. A swab of the inside waistband revealed a mixed DNA profile that matched Truehill, Johnson, Hughes, and Marcus as possible contributors.

Police also conducted a search in Marcus's motel room, where Marcus had initially taken Truehill, Hughes, and Johnson after they ran out of money, and found a black sheath for a knife and a pair of Giovanni blue jeans on Marcus's bed, among other items. DNA testing on the Giovanni jeans revealed a complete DNA profile that matched Binder, a DNA profile that matched Brenda Brown, a mixed DNA profile with Brown as the major contributor and Johnson as a possible minor

contributor, and a mixed DNA profile with Binder as the major contributor and Johnson as a possible minor contributor.

Law enforcement officers found Binder's decomposed body in an open field near I-95 in St. Augustine, Florida. Binder's hat was about twenty-five feet away from his body with a straight-line cut on the bill going toward the hat. Binder had four stab wounds to his back and blunt-force injuries to his left head area that penetrated into the cranium. Approximately ten chopping-type injuries to the back of Binder's head caused fractures and a four-inch hole in the back of his head. In addition, Binder's ribs were fractured, his ulna bone in the left forearm was fractured, and the radius was dislocated—classic defensive injuries. Binder also sustained chopping injuries on his hands, causing fractures that also could be considered to be defensive injuries. Dr. Frederick Hobin, the medical examiner, opined that two knives were used to kill the victim, and that some of the wounds were consistent with a machete, while the stab wounds were caused by a different knife. Michael Warren, the Assistant Director of the William R. Maples Center for Forensic Medicine, assisted in Binder's autopsy and opined that the knife in evidence could have caused the injuries to Binder's cranium.

The jury found Truehill guilty of both counts of murder and kidnapping.

## Penalty Phase

In the penalty phase, the State first called Kenneth Stutes, a retired prosecutor from Lafayette, Louisiana, who testified that Truehill pled guilty to manslaughter in the shooting death of James Bourgeois. Truehill was sentenced to thirty years for this crime and was serving this sentence at the time of the escape from prison and subsequent murder. In addition, Truehill was convicted of a 2006 armed robbery in Louisiana, and the victim in that case testified that two masked men jumped into his vehicle and robbed him. Isadore White testified that Truehill was her neighbor and friend and admitted his own involvement in that robbery. Finally, the State submitted victim-impact statements from Beth Frady, Dr. Davis Houck (a Florida State University professor), and Binder's aunt, who raised him after his mother died when he was eleven years old.

Truehill presented several witnesses to establish mitigation. Eleanor Smith, the mother of Truehill's former girlfriend, testified that when Hurricane Katrina hit New Orleans, she and her daughter were unable to leave the city so Truehill came to their house to ride out the storm with them. They thought they had survived the storm with minimal damage, but after the levees burst, the flooding water drove them into the attic. They had to be rescued by boat from their rooftop, which was a very traumatic experience. Smith observed how Truehill changed after the hurricane and how the storm had a significant impact on him.

Walter Goodwin, a teacher and then principal in New Orleans, knew Truehill and testified that Truehill was more of a follower who wanted to be "one of the guys." Truehill became more withdrawn after his parents divorced, and Goodwin encouraged Truehill to get counseling.

Next, Truehill called his stepmother, Miranda Truehill, who testified that she stayed with Truehill's parents briefly when her marriage was falling apart. She left for Australia and when she returned, she learned that Truehill's parents had divorced. She moved in with Truehill's father, and they married soon after. Truehill was just beginning high school and did not adjust well to his parents' divorce or his father's remarriage. She also stated that Truehill was an unhappy child and was more of a follower than a leader.

Marshall Truehill, Jr., Truehill's older brother, testified that when he was growing up at home with Truehill, they witnessed some domestic discord, which frightened Truehill. Jessica Truehill, Truehill's sister, also testified about their upbringing, discussing the fighting that occurred between their parents and how their father was a strict disciplinarian. She discussed how another student was shot at Truehill's school and how Truehill had a girlfriend whose child died of Sudden Infant Death Syndrome and who later died herself. Truehill became more angry and withdrawn and felt misunderstood. She also stated that although Truehill had previously shot someone, he was really scared and nervous after it happened.

Valli Truehill, Truehill's mother, testified about her marriage to Truehill's father, including the physical, verbal, and emotional abuse that she suffered in front of the children. She stated that when they divorced, Truehill's father sat the children down and explained why they were divorcing, including sexually graphic descriptions of their lack of sexual intercourse, which shocked the children. After the divorce, she had a difficult time obtaining child support and was finally forced to move in with her father. She described how Truehill was upset over the divorce and remarriage and how Hurricane Katrina only made him angrier and more hostile.

Mr. Aiken, a defense expert on prisons and prison life, testified that Truehill could be managed for the rest of his life in a maximum security setting without a risk of harm to staff, inmates, or the general community. In addition, Dr. Fredrick Sauter, a clinical psychologist, testified that Truehill suffers from post-traumatic stress disorder (PTSD) and depression.

In rebuttal, the State called Dr. Prichard, who opined that the level of trauma experienced by Truehill did not rise to the level to support PTSD. He further asserted that, based on reviewing Truehill's history, he did not believe that Truehill was merely a follower, but was actually a leader. In addition, the State played a jailhouse conversation between Truehill and his mother where Truehill's mother

suggested that he could attempt to use the storm to explain why he did strange things.

After hearing all of the aggravation and proposed mitigation, the jury recommended that Truehill be sentenced to death by a unanimous vote of twelve to zero.

During a Spencer[3] hearing before the trial judge, the State submitted nine additional victim-impact statements. Truehill presented additional testimony from his aunt, Diedra Humphrey, who testified that she visits her nephew weekly and he has a calm demeanor and reads many books, including the Bible. His mother testified again, concerning additional traumas that Truehill encountered.

After considering the jury's recommendation and all of the evidence, the trial court found six aggravating factors applied, analyzing each aggravator in great detail, and assigning each great weight: (1) Truehill was under a sentence of imprisonment at the time of the crime; (2) Truehill had a prior violent felony; (3) Truehill committed the murder while engaged in the commission of a kidnapping or robbery; (4) the murder was committed for the purpose of preventing a lawful arrest; (5) the murder was especially heinous, atrocious, or cruel (HAC); and (6)

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP).

The trial court then analyzed whether a sentence of death was appropriate based on an Enmund/Tison[4] analysis and determined the death sentence was appropriate because Truehill was a major participant in Binder's murder and had demonstrated a reckless disregard for human life. The trial court concluded that Truehill's culpability in the robbery, kidnapping, and murder of the victim "is well established and conclusively proven beyond a reasonable doubt."

The court weighed this aggravation against five statutory mitigating circumstances and forty nonstatutory mitigating circumstances. The court found Truehill failed to prove the statutory mitigator pertaining to Truehill's age (he was 22) but did find four statutory mitigators had been proven by the greater weight of the evidence and gave mitigating circumstances 1-3 "less than slight weight," and mitigating circumstance 4 slight weight: (1) the defendant was under the influence

_____

4. In Enmund v. Florida, 458 U.S. 782 (1982), the United States Supreme Court held that the Eighth Amendment of the United States Constitution does not permit imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Id. at 797. In Tison v. Arizona, 481 U.S. 137 (1987), the Supreme Court expanded the Enmund culpability requirement for imposing a death sentence under a felony murder theory to include "major participation in the felony committed, combined with reckless indifference to human life." Id. at 158.

of mental or emotional disturbance; (2) the capacity to appreciate the criminality of his conduct or conform to the requirements of law was substantially impaired; (3) the crime was committed by another person and Truehill had only a minor role; (4) Truehill acted under extreme duress or the substantial domination of another person.

The court then weighed the nonstatutory mitigation and found Truehill had proven forty nonstatutory mitigators, but gave most of the mitigation slight to no weight. The court, however, did find four mitigating factors were entitled to moderate weight: (1) Truehill experienced the trauma of witnessing the unfolding of a retaliatory murder; (2) he helped his girlfriend and her mother escape the flooding of Hurricane Katrina; (3) Truehill jumped into the water to save his girlfriend when she fell out of the boat; and (4) when escaping the flooding from Hurricane Katrina, Truehill was able to procure a car.

The trial court agreed with the jury's unanimous vote and imposed a death sentence, finding that the presence of six aggravating factors outweighed four statutory mitigating circumstances and forty nonstatutory mitigating circumstances. Truehill appeals.

## ANALYSIS

On appeal, Truehill raises six issues: (1) the trial court erred in overruling the state's use of a peremptory challenge to an African-American juror;

- 14 -

(2) excluding people due to their age from the jury venire violates the constitution; (3) the trial court erred in permitting the State to introduce evidence of other crimes; (4) the cumulative effect of improper closing comments warrants a new trial; (5) the trial court's erroneous rulings during the penalty phase deprived Truehill of a fair trial; and (6) Florida's death sentencing scheme is unconstitutional based on Ring v. Arizona, 536 U.S. 584 (2002). In addition, we discuss the proportionality of the sentence of death and the sufficiency of the evidence. While Truehill's case was pending before this Court, the United States Supreme Court issued its ruling in Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616, 619 (2016), holding Florida's death penalty sentencing scheme unconstitutional. Truehill requested, and this Court granted, supplemental briefing on the applicability of Hurst v. Florida to this case. We address each of these claims in turn, discussing guilt claims first, including sufficiency of the evidence, and then turning to penalty phase claims, including Truehill's claim for relief pursuant to Hurst v. Florida and the proportionality of Truehill's sentence of death.

## I. Peremptory Challenge of an African-American Juror

In Truehill's first claim on appeal, he argues that the trial court erred in upholding the State's peremptory strike of Juror Brooks, an African-American prospective juror, on the grounds that the strike was racially motivated. Specifically, Truehill argues that the State's asserted "race-neutral" reason—that

- 15 -

the Juror was not forthcoming about her experience with crime—was not supported by the record and was pretextual. The State argues in response that the claim is not properly preserved for appeal, and furthermore, that the trial court conducted an adequate inquiry and properly found that the State's race-neutral reason was genuine.

During jury selection, the trial court asked the Juror, "Have you or any member of your immediate family ever been charged with a crime or been the victim of a crime?" She responded that she herself had an aunt who was the victim of domestic violence, but never mentioned that she had sought an injunction against her ex-husband in 2010, which included allegations of violent behavior and threats that her ex-husband had allegedly made in the past. The State asked the Juror numerous questions about whether she had immediate family members, friends, or people with whom she was close with who were victims of a crime or charged with a crime, and she discussed only her aunt.

Since the State ran a prior background check on all the prospective jurors and learned about the injunction that the Juror had sought, the State used a peremptory challenge on this prospective juror, arguing that she was not straightforward, had questions in her background, and had experienced psychological issues. The defense counsel challenged the use of a peremptory challenge, asserting that the Juror may not have thought the injunction was a

criminal matter. After the trial court questioned the Juror, it sustained the State's challenge.

The trial court's decision to uphold a peremptory strike is reviewed for an abuse of discretion. Files v. State, 613 So. 2d 1301, 1304 (Fla. 1992). Trial courts have broad discretion in determining the propriety of the exercise of peremptory challenges. Fotopoulos v. State, 608 So. 2d 784, 788 (Fla. 1992).

When a party exercises a peremptory strike and the party's reasons for exercising the peremptory strike are put in issue, the trial court must examine the party's reasons for exercising the strike. State v. Johan, 613 So. 2d 1319, 1321 (Fla. 1993); State v. Neil, 457 So. 2d 481, 486 (Fla. 1984). As this Court stated in Melbourne v. State, 679 So. 2d 759 (Fla. 1996):

> A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venire person is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
>   At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not pretext, the strike will be sustained (step 3).

Id. at 764 (footnotes omitted). "In deciding whether the proffered race-neutral reason for the peremptory strike is a pretext, the Court should focus on the genuineness of the explanation, not the reasonableness." Poole v. State, 151 So. 3d

402, 410 (Fla. 2014). Although reasonableness is a factor to be considered in determining the genuineness of the explanation, the Court should also consider all relevant circumstances surrounding the strike, including "the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment." Id. (quoting Nowell v. State, 998 So. 2d 597, 602 (Fla. 2008)).

The State argues that the defense did not preserve for appeal whether the underlying facts of the challenge are supported by the record. See, e.g., Hoskins v. State, 965 So. 2d 1, 9 (Fla. 2007); Fotopoulos, 608 So. 2d at 788; Floyd v. State, 569 So. 2d 1225, 1229-30 (Fla. 1990). A review of the record demonstrates that the defense objected based on the genuineness of the State's reason and that the Juror was being straightforward, but simply did not consider the injunction a criminal matter. Thus, this ground is preserved.

Pertaining to whether the Juror was straightforward, the trial court did not abuse its discretion in finding that there was an "omission in disclosing some of the information." The Juror responded to the question of whether she or a member of her family had been the victim of a crime by offering that her aunt was the victim of domestic violence when the Juror was only seven or eight years of age, which shows that the Juror considered domestic violence a crime. Yet, she failed to mention her own, more recent experience with domestic violence underlying her

- 18 -

petition for an injunction. The petition itself indicates that her ex-husband committed various crimes against her and her children. She did not volunteer this information when asked multiple times whether she or a family member was ever a victim of a crime. Therefore, the trial court had the discretion to determine that the State's reason for the peremptory was genuine and not pretextual.

Applying the factors discussed in Poole further shows that the trial court did not abuse its discretion in determining that the reason was genuine. Although the Juror was the only African-American in the first panel, she was not the only one in the entire venire, and other African-American jurors were ultimately selected to be on the jury. Nothing in the record suggests that the State's strike was based on a reason equally applicable to an unchallenged juror or that she was singled out for special treatment.

Thus, the trial court did not err in overruling Truehill's objection to the State's use of a peremptory challenge on the Juror.

## II. Excluding Jurors Based on Age from the Jury Venire

In his next claim, Truehill argues that this Court should treat age as a protected class by extending the reasoning of Batson v. Kentucky, 476 U.S. 79 (1986), and State v. Neil, 457 So. 2d 481 (Fla. 1984), which prohibit removing a potential juror based on race because it violates equal protection. Truehill essentially asks that this Court classify "young people" as a cognizable class and

grant Truehill a new trial because the State struck all potential jurors falling into this category.

This Court has previously rejected this very claim, holding that "young adults do not constitute a cognizable class." Bryant v. State, 386 So. 2d 237, 241 (Fla. 1980). In support, this Court noted that the majority of other jurisdictions have reached the same conclusion. Id. at 240-41. However, although this Court has never held that age is a legitimate race-neutral reason for a peremptory challenge, district courts in this state have. See Saffold v. State, 911 So. 2d 255, 256 (Fla. 3d DCA 2005) (holding that peremptory challenge based on age of prospective juror is permissible); Daniels v. State, 837 So. 2d 1008, 1009 (Fla. 3d DCA 2002) (same); Cobb v. State, 825 So. 2d 1080, 1085 (Fla. 4th DCA 2002) (concluding that it was not unreasonable to strike a prospective juror in a drug case when the State genuinely believed that the prospective juror's youth and status as a student would cause her to be more lenient).

As this Court has held, in order to show discriminatory selection under Castaneda v. Partida, 430 U.S. 482, 494 (1977), a defendant must establish "(a) substantial underrepresentation of (b) an identifiable group that (c) is a recognizable, distinct class which (d) is singled out for different treatment by (e) comparing the group's proportions in both the population and on grand juries (f) over a significant period of time." Bryant, 386 So. 2d at 240. In applying that test

to "young adults," this Court held that the defendant submitted insufficient proof to support her claim because her "statistics on young adults cover[ed] only the year 1978," which was not a statistically significant period of time. Id. at 240 n.5. To the extent that Truehill asks this Court to reconsider its prior decision in Bryant, he has failed to present any statistics on young adults or other information to comply with the necessary showing that young adults should be treated as a protected class.

Thus, we deny relief on this claim.

### III. Erroneous Admission of Evidence of Other Crimes

Truehill contends that the trial court erred in permitting the State to introduce evidence of other crimes or acts for the purpose of proving a material fact in issue. Specifically, while the State sought to introduce a number of crimes other than Binder's kidnapping and murder, nine of those involved the use or attempted use of the victim's bankcard in various locations as detailed in the statement of facts. The other crimes involved the codefendants' escape from jail and various robberies committed along their route. The trial court specifically found that the evidence at issue was a mixture of Williams-rule[5] evidence and evidence that was relevant under section 90.402, Florida Statutes (2010).

---

5. Williams v. State, 110 So. 2d 654 (Fla. 1959).

However, the trial court stated, "I'm going to find that the evidence is admissible but I'm going to qualify that statement by saying the following: That evidence cannot become a feature of the trial, and I reserve the right to limit it at any time if I find that it's becoming a feature of the trial." The trial court carefully kept its prior ruling in mind during the trial and the witnesses in the prior crimes provided very limited testimony regarding these prior crimes. "A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. The trial court's discretion is constrained, however, by the application of the rules of evidence and by the principles of stare decisis." McDade v. State, 154 So. 3d 292, 300 (Fla. 2014) (quoting Hayward v. State, 24 So. 3d 17, 29 (Fla. 2009)).

As this Court has previously held, "Admissible evidence of uncharged crimes falls into two categories: 'similar fact' evidence and 'dissimilar fact' evidence." Victorino v. State, 23 So. 3d 87, 98 (Fla. 2009) (quoting Zack v. State, 753 So. 2d 9, 16 (Fla. 2000)) (internal quotation marks omitted). Similar fact evidence, also known as Williams-rule evidence, "is governed by the requirements and limitations of section 90.404, [Florida Statutes (2004)]," id., which permits "evidence of other crimes, wrongs, or acts . . . when relevant to prove a material fact in issue," such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id. (quoting § 90.404, Fla.

Stat.). Dissimilar fact evidence is governed by section 90.402 and has been described as follows:

> [E]vidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not Williams rule evidence. It is admissible under section 90.402 because "it is a relevant and inseparable part of the act which is in issue. . . . [I]t is necessary to admit the evidence to adequately describe the deed."

Griffin v. State, 639 So. 2d 966, 968 (Fla. 1994) (quoting Charles W. Ehrhardt, Florida Evidence, § 404.17 (1993 ed.)). The admissibility of both categories— similar fact evidence and dissimilar fact evidence—is determined by its relevancy and, of course, subject to exclusion under the balancing test of section 90.403, Florida Statutes (2010). Id. In establishing its case, the State "is entitled to present evidence which paints an accurate picture of the events surrounding the crimes charged," Griffin, 639 So. 2d at 970, but cannot "make the evidence of other crimes the feature of the trial or . . . introduce the evidence solely for the purpose of showing bad character or propensity." Smith v. State, 866 So. 2d 51, 61 (Fla. 2004).

In this case, the State sought to introduce evidence pertaining to eighteen uncharged crimes, most of which involved the use of the victim's bankcard. Such use of the victim's bankcard clearly establishes the motive behind the murder and demonstrates that the codefendants possessed the victim's bankcard. Thus, the evidence of those crimes was clearly relevant.

- 23 -

Once the relevancy of the evidence is determined, the trial court must also balance whether the probative value of the relevant evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence.  Wright v. State, 19 So. 3d 277, 296 (Fla. 2009).  Here, as stated above, the evidence of the uncharged crimes is highly probative in establishing both the motive for the crime and that the codefendants possessed the victim's bankcard.  While the evidence of the crimes is also prejudicial, this prejudice does not substantially outweigh the highly probative nature of the evidence.

In addition, the State sought to introduce evidence pertaining to (1) the escape from Avoyelles Parish Jail in Marksville, Louisiana, on March 30, 2010; (2) the theft of Stephen Mose's truck in Masura, Louisiana, on March 30, 2010; (3) the robbery of LeAnn Williams by taking her purse in Broussard, Louisiana, on March 30, 2010; (4) the subsequent use of Williams' credit card at two gas stations in Louisiana on March 30 and March 31, 2010; (5) the robbery and attempted murder of Brenda Jo Brown in Pensacola on April 1, 2010; (6) the attempted armed robbery of Mario Rios in Tallahassee on April 1, 2010; and (7) the armed robbery of Chris Pavlish in Tallahassee on April 1, 2010.  Each of these prior crimes must be reviewed individually.

We conclude that the evidence of the other crimes involves relevant dissimilar fact evidence and not <u>Williams</u>-rule evidence. A review of the uncharged crimes does not demonstrate the type of similarity between the crimes that generally occurs in <u>Williams</u>-rule evidence, but it does show the evidence that is probative of a material issue regarding the crime in question, which cannot be separated from Binder's kidnapping and murder. Evidence is inextricably intertwined if it is necessary to "(1) 'adequately describe the deed' (2) provide an intelligent account of the crime(s) charged, (3) establish the entire context out of which the charged crime(s) arose, or (4) adequately describe the events leading up to the charged crime(s)." <u>Dorsett v. State</u>, 944 So. 2d 1207, 1213 (Fla. 3d DCA 2006) (citations omitted).

Four of the prior crimes involved a robbery or armed robbery of various victims, in which the prior victims generally testified that Truehill used force in attempting to steal their items. In contrast, while no eyewitnesses could testify as to Binder's interaction with the codefendants, the evidence shows that Binder was taken, transported to St. Augustine in a stolen truck, and then killed in an empty field—none of which occurred in the prior crimes.

An examination of most of the prior crimes demonstrates that the uncharged crimes are probative of a material issue regarding the crime in question, and the uncharged crimes are inextricably intertwined with the evidence of the crime

charged. As addressed in Griffin, this is not Williams-rule evidence, but relevant dissimilar fact evidence. Thus, we must consider each crime separately to determine its relevancy to the charges here and, of course, keep the balancing test of section 90.403 in mind.

The theft of Mose's truck from Masura on March 30, 2010, became an inextricable part of this crime because the codefendants used it to kidnap and transport the victim to St. Augustine. Further, because the codefendants used the vehicle for a considerable time period, a significant amount of evidence was found in the vehicle, including a green washcloth with the victim's DNA on it. This Court has previously held that a truck stolen for use during a robbery is inextricably intertwined with the robbery itself. See Foster v. State, 679 So. 2d 747, 753 (Fla. 1996).

Evidence from Truehill's taking of Williams' purse by force or threat in Broussard, Louisiana, is likewise inextricable from the evidence involved in this crime. Specifically, on March 30, Williams had her purse snatched from her as she was exiting her vehicle in a shopping plaza, and a video from the shopping plaza showed that the black truck was present. Further, Williams' identification card, which was in her purse when it was stolen, was found inside the black truck. Once Williams realized the codefendants were using her credit card, she contacted the bank to prevent additional unauthorized use of her card, so the codefendants were

unable to use the card any longer. This established a motive behind killing Binder after taking his bankcard, as it would prevent him from reporting the card as stolen.

The robbery and attempted murder of Brown in Pensacola on April 1, 2010, is likewise an inextricable part of this crime. Brown identified Truehill and his codefendants as the men who attacked her and was able to describe the knives that the codefendants possessed and used—knives that were consistent with the murder weapons in this case. Further, her blood was found on a pair of Giovanni blue jeans that also had a complete DNA profile that matched Binder, and mixed DNA profiles in which Johnson was found to be a possible minor contributor. Thus, this evidence directly linked the person who injured Brown with the person who stabbed and killed Binder.

Finally, the armed robberies of the Tallahassee victims on April 1, 2010, are an inextricable part of this crime. Rios testified that Truehill jumped out and grabbed him, demanding all of his possessions at knifepoint. He further identified the knife in evidence as being consistent with the knife that he saw. In addition, police were able to test DNA on the portion of Rios's shirt that Truehill grabbed to determine that it did match Truehill. Likewise, Pavlish testified that Truehill grabbed her, brandishing a large knife that she described, and stole her purse. Some of her personal items were in the black truck found after it had been abandoned in Miami. In addition, these two witnesses provided relevant evidence

that Truehill and the codefendants were in Tallahassee shortly before the victim was kidnapped and possessed weapons consistent with the murder weapons.

This Court has previously held that prior robberies, thefts, and murders have all been considered inextricably intertwined evidence where their fruits were used in the crime charged or help describe the crime at issue. Hunter v. State, 660 So. 2d 244, 251 (Fla. 1995) (armed robbery preceding subsequent robbery and murder were inextricably intertwined). Further, this Court has previously held prior crimes were inextricably intertwined with the charged crime, even though the evidence was both temporally and geographically removed from the crime at issue. Wright v. State, 19 So. 3d 277, 283, 292-93 (Fla. 2009) (crimes in multiple cities during a three-day crime spree across central Florida were inextricably intertwined); Heiney v. State, 447 So. 2d 210, 211-13 (Fla. 1984) (shooting in Texas preceding beating victim in Florida admitted as inextricably intertwined evidence). Even the most heinous and numerous crimes have been allowed as inextricably intertwined and found to have probative value that outweighed prejudice to the defendant. Zack v. State, 753 So. 2d 9, 15-17 (Fla. 2000) (probative value of thefts, sexual assault, and murder outweighed prejudice); Wournos v. State, 644 So. 2d 1000, 1007 (Fla. 1994) (probative value of six murders outweighed prejudice). We conclude that the trial court did not err in permitting the State to present evidence pertaining to the robberies against the other victims. We emphasize, however, that this decision

could have been different if evidence of other crimes had become the focus and feature of the trial.

We reach the same conclusion pertaining to the escape from the Avoyelles Parish Jail on March 30, 2010. The State asserts that this piece of evidence was admissible because Truehill's escape from the jail "began his crime spree across the Gulf Coast and established his method of working in concert with Hughes and Johnson." The trial court found:

> Those facts that preceded the kidnapping of Vincent Binder tell the story which ultimately ends with his death. To consider the kidnapping and killing of Vincent Binder in a vacuum; that is without knowing the antecedent events that had taken place just prior to Vincent Binder's death kidnapping, would have misled the jury into a story that would have made little or no sense.

The evidence of the escape from prison, admitted in a limited capacity, showed how the codefendants met and what preceded their crime spree—facts that the trial court found to be necessary to "establish the entire context out of which the charged crime(s) arose" and to "adequately describe the events leading up to the charged crime(s)." Dorsett, 944 So. 2d at 1213.

Truehill relies on this Court's ruling in Czubak v. State, 570 So. 2d 925, 928 (Fla. 1990), to argue that the trial court's admission of the escape evidence was improper. In that case, the defendant was charged with murdering his roommate, with whom he had lived for two months. Id. at 926. A witness who knew the defendant and suspected he may have "done something" testified that she had told

- 29 -

her uncle about her suspicions but did not ask him to investigate the defendant; however, if she had, she would have known he was an escaped convict at the time—an answer that was completely unresponsive to the question asked and unexpected. Id. at 927-28. The defendant moved for a mistrial. Id. at 927. This Court held that the reference to the defendant being an escaped convict was "clearly inadmissible" and had no relevance to any material issue in the case. Id. at 928. We further recognized that the "[e]rroneous admission of collateral crimes evidence is presumptively harmful." Id. Since the case against the defendant was largely circumstantial, we granted a new trial, explaining that we were unable to determine "beyond a reasonable doubt that the verdict was not affected by the revelation that he was an escaped convict." Id.

Czubak is factually distinguishable. First, Czubak had been living with the victim for approximately two months at the time of the murder, meaning that his escape from prison must have been at least two months prior to the murder. In this case, on the other hand, the victim was murdered only three days after Truehill and the other codefendants escaped from prison. Moreover, Czubak was living with the victim and committed the crime alone. By contrast, here, Truehill acted together with codefendants with no connection to him other than the prison where they were all housed. Additionally, the victim was completely unknown to Truehill. Accordingly, in Czubak, there was no justification for using the prison

escape evidence to explain either Czubak's access to the victim or his motive for the crime, while in the present case there was.

Further, the evidence of the prison break did not become a feature of the trial. The trial court emphasized this point, stating: "I'm going to find that the evidence is admissible but I'm going to qualify that statement by saying the following: That evidence cannot become a feature of the trial, and I reserve the right to limit it at any time if I find that it's becoming a feature of the trial."

Accordingly, we deny relief as to this claim.

## IV. Allegedly Improper Closing Comments

Next, Truehill challenges five objected-to comments that the prosecutor made during closing arguments. In reviewing this claim, we keep in mind the proper standards that apply to each comment. For those comments to which the defense objected and the trial court erroneously overruled defense counsel's objection, we apply a harmless error test. See Snelgrove v. State, 921 So. 2d 560, 568 (Fla. 2005); Doorbal v. State, 837 So. 2d 940, 956-57 (Fla. 2003). Where the trial court denied a motion for mistrial, we review that ruling under an abuse of discretion standard. See Belcher v. State, 961 So. 2d 239, 255 (Fla. 2007) (explaining that, where the trial court erroneously overrules an objection to improper prosecutorial comments, this Court reviews the comments for harmless

error and the denial of the motion for mistrial based upon the comments for abuse of discretion).

"[W]ide latitude is permitted in presenting opening and closing statements to a jury, and comments by the prosecutor will merit a mistrial only when they deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered." Miller v. State, 161 So. 3d 354, 382 (Fla. 2015) (citation omitted). "We do not examine the allegedly improper comments in isolation." Card v. State, 803 So. 2d 613, 622 (Fla. 2001). Instead, we "examine[] the totality of the errors in the closing argument and determine[] whether the cumulative effect of the numerous improprieties deprived the defendant of a fair [trial]." Id. (citations omitted).

The first area of impropriety concerns the prosecutor's alleged violation of the Williams-rule instruction when the prosecutor stated:

> Leann Williams, you remember her testimony. She lived in the area of Broussard, Louisiana which is just south of Marksville, Louisiana where the defendant and his partners in crime escaped in the Avoyelles Parish Jail.

At that point, defense counsel objected and asked for a sidebar, wherein defense counsel argued that referring to the codefendants as "partners in crime" violated the court's order not to consider the escape from jail as a crime. The trial court

sustained the objection and admonished the prosecutor to refer to the bad acts as "circumstances" rather than crimes, even though the court noted that the jury would be well aware that the acts described were crimes. The trial court then denied the motion for mistrial but granted the defendant's request for a curative instruction and re-read the Williams-rule instruction to the jury.

Truehill contends that the denial of the motion for mistrial is contrary to the holding in Pacifico v. State, 642 So. 2d 1178, 1182 (Fla. 1st DCA 1994). The circumstances presented there are significantly different from this case. In Pacifico, the prosecutor impermissibly used a defendant's prior convictions in a manner to imply the defendant had a propensity to commit crimes and continued to emphasize this point throughout closing arguments, despite the fact that the trial court repeatedly sustained defense counsel's objections. Id. at 1181-83. Further, the prosecutor used name-calling as a feature of the closing arguments. Id. Based on those and numerous other types of improper argument, the district court granted a new trial. Id. at 1184-85.

In contrast, in this case, the comment "partners in crime" was very minor, the trial court sustained the objection and provided a curative instruction, and then the prosecutor did not mention this again. This very brief statement did not deprive the defendant of a fair and impartial trial or materially contribute to the conviction.

The second area of impropriety concerns the prosecutor injecting his own personal belief on the evidence:

> The independent-act doctrine—and when you really break it down and think about it, it really is not going to affect premeditated murder because, if you think about it, we have proven that this defendant was involved in premeditated murder. We have shown the facts that we believe and the facts that show—

Defense counsel objected immediately, and at sidebar, moved for a mistrial. The trial court sustained the objection and denied the motion for mistrial. After admonishing the prosecutor to "just talk about the evidence and what—what it shows or doesn't show," the judge then instructed the jury that closing arguments were not evidence or instructions on the law, but to aid the jury in its understanding of the case. Afterwards, the prosecutor resumed his argument, stating: "When you look at the evidence, ladies and gentlemen, you will see—and, of course, it's your determination whether or not premeditated murder even falls within that instruction. I would submit to you, ladies and gentlemen, that it does not."

A prosecutor may not express his or her personal belief on the defendant's guilt in a case. Valentine v. State, 98 So. 3d 44, 55 (Fla. 2012). In this case, before the prosecutor even finished the sentence, defense counsel promptly objected, and the trial court sustained the objection and provided a curative instruction to the jury. The prosecutor immediately emphasized to the jury that the

- 34 -

jury was charged with determining the relevant questions in the case. Because the objection occurred so early into the statement, it is unclear whether the jury would even have been aware where the prosecutor was going with the statement. However, based on the corrective instruction from the trial judge and how the prosecutor then worded the remainder of his argument, this statement had little, if any, impact on the jury. The trial court did not abuse its discretion in denying in the motion for mistrial.

Third, Truehill contends that the prosecutor improperly restated his initial closing argument during his rebuttal argument. Defense counsel objected to this line of rebuttal, stating that while the defense recognized that much of what the prosecutor's argument involved "things I touched on, but [the prosecutor's] limited in his second closing to only facts that we talked on . . . [s]o all they are doing is step by step doing things, whether I talked about it or not. . . . He doesn't have the right to do two initial closings." The prosecutor replied that he was entitled to rebut the defense's argument that there was a lack of proof as to Truehill's involvement. The trial court overruled the objection.

We conclude that the prosecutor's argument on this point was not improper. The prosecutor was setting forth a timeline, pointing out Truehill's involvement as to each step. During the rebuttal, the prosecutor specifically addressed points raised previously by defense counsel.

In the fourth allegedly improper comment, toward the end of the closing argument rebuttal, the prosecutor stated, "Justice demands a verdict of guilty, ladies and gentleman. Vince, he deserves justice." Defense counsel objected and then moved for a mistrial at sidebar, asserting that this statement improperly inflamed the passions of the jury and also misstated the law. The trial court overruled the objection, stating, "I don't believe he is appealing to the sympathy or anything like that." The prosecutor did not use this statement again during the guilt phase.

As to the "justice for the victim" arguments, the trial court erred in overruling the objection. As we recently held, "this type of comment has been considered improper under clearly established Florida law for over three decades." Cardona v. State, 185 So. 3d 514, 522 (Fla. 2016); see also Davis v. State, 136 So. 3d 1169, 1197-98 (Fla. 2014) (determining that the argument that the victim's siblings would want to know what justice was imposed for the victim's murder was improper); Dorsey v. State, 942 So. 2d 983, 986 (Fla. 5th DCA 2006) (declaring that "demanding justice for the victim" was improper); Shaara v. State, 581 So. 2d 1339, 1341 (Fla. 1st DCA 1991) (determining that "the prosecutor's comment that the victim was asking the jury for justice" was improper); Edwards v. State, 428 So. 2d 357, 359 (Fla. 3d DCA 1983) (criticizing the prosecutor's argument, which included "All I'm going to ask you for is justice. I ask you for justice both on

behalf of myself and the people of the State of Florida, also on behalf of [victim's] wife and children."). Similar to <u>Williams</u> and dissimilar to <u>Cardona</u>, this statement was an isolated comment and thus, it alone would not mandate reversal. <u>See</u> <u>Davis</u>, 136 So. 3d at 1197 (where this Court denied relief where the prosecutor argued during the penalty phase that the victim's family would want to know "what justice was done," but the reference to the victim's family was an isolated comment and was only made once).

In the fifth area of impropriety, Truehill contends that the State improperly used the message-to-the-community argument. Specifically, the prosecutor stated, "If you find the evidence in this case was proven beyond a reasonable doubt, then through your verdict . . . , let this defendant know that you can't kidnap people, let him know that you can't rob people . . . ." Defense counsel objected and, at sidebar, moved for a mistrial, asserting that prosecutor impermissibly used the message-to-the-community argument as a basis for a conviction. The trial court sustained the objection, denied the motion for mistrial, and instructed the jury to disregard the last statement made by the prosecutor.

This Court has clearly stated that "prosecutors may not ask the jury to send a message through its verdict." <u>Fletcher v. State</u>, 168 So. 3d 186, 209 (Fla. 2015); <u>see, e.g.</u>, <u>Campbell v. State</u>, 679 So. 2d 720, 724 (Fla. 1996); <u>Card</u>, 803 So. 2d at 622. In <u>Card</u>, this Court addressed a derivative of that improper argument, where

the prosecutor argued in closing that the jury was "the conscience of this community." 803 So. 2d at 622. The Court held that a new trial was not warranted, emphasizing that the reference was isolated and the prosecutor did not continue with the argument after the defense attorney objected and thus the trial court did not err in denying the mistrial, as "the comments were not so prejudicial as to vitiate the entire trial." Id.; see also Thornton v. State, 767 So. 2d 1286, 1288 (Fla. 5th DCA 2000) (holding that even if the argument was a "send a message" argument, it was harmless). Similarly, in this case where the defense objected immediately and the trial court instructed the jury to disregard such a statement, the trial court did not err in denying the motion for mistrial.

Finally, in reviewing all of the improper arguments cumulatively, we conclude that Truehill is not entitled to relief. As addressed above, a mistrial is warranted only where the improper closing arguments "deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered." Miller, 161 So. 3d at 382.

While the prosecutor should not have made the argument involving justice for the victim and appealing to the jury to "send a message" for the community, the prosecutor did not continue to make the same comments during his rebuttal after

the defense's objection, so the comments were brief. Thus, we conclude that relief is not warranted on this claim.

## V. Sufficiency of the Evidence

Even though Truehill does not raise this issue, this Court has a "mandatory obligation to determine the sufficiency of the evidence to sustain the homicide conviction." Jones v. State, 963 So. 2d 180, 184 (Fla. 2007). In deciding this matter, "the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)). As the conviction in this case is based wholly upon circumstantial evidence, a special standard of review applies. "Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." Gosciminski v. State, 132 So. 3d 678, 710 (Fla. 2013) (quoting State v. Law, 559 So. 2d 187, 188-89 (Fla. 1989)). The State need not "rebut conclusively every possible variation of events which could be inferred from the evidence, but they need only to introduce competent evidence which is inconsistent with the defendant's theory of events." Id. (quoting Law, 559 So. 2d at 189) (internal quotation marks omitted). Courts will sustain a

- 39 -

conviction based solely on circumstantial evidence so long as the evidence is "(1) 'consistent with the defendant's guilt' and (2) 'inconsistent with any reasonable hypothesis of innocence.' " Delgado v. State, 948 So. 2d 681, 689-90 (Fla. 2006) (quoting Orme v. State, 677 So. 2d 258, 261 & n.1 (Fla. 1996)).

The jury found Truehill guilty of first-degree murder based on theories of premeditation and felony murder. Although his conviction is based wholly upon circumstantial evidence, Truehill did not propose any reasonable hypothesis of innocence in this case.

A review of the record demonstrates that competent, substantial evidence supports Truehill's conviction for the first-degree murder of Vincent Binder. The record in this case shows that after Truehill and his codefendants left Louisiana in a stolen black truck, they arrived in Tallahassee, Florida, around April 1. That evening, Truehill, Johnson, and Hughes were in the area of the kidnapping when the codefendants, brandishing a knife, attempted to grab two other people unsuccessfully. Pavlish identified Truehill as the man who exited a black truck, pulled out a very long knife, and pulled her toward the truck as he told her to give him her purse. She struggled, breaking free of his grasp, but left her purse behind, which contained all of her important documents, including her high school diploma and her Social Security card. Some of her personal items were later found in the stolen truck.

Binder had his bankcard with him earlier that evening when he made a purchase at a gas station. He then joined some friends at their home, where they studied until midnight. Binder decided to walk home, which was about a mile away. Fifteen minutes after Binder left his friends' house, Truehill was videotaped using Binder's bankcard at the ATM machine inside the Half Time Keg store, without Binder's presence, as Truehill withdrew money from Binder's account. Binder did not have any connections to Truehill or the other two codefendants.

A few hours later, around 2:33 a.m., on April 2, 2010, Binder's bankcard was used in Jacksonville, Florida, to make additional gasoline purchases. Truehill and his codefendants successfully used Binder's bankcard as they continued toward Miami, including using it in Daytona Beach, Fort Pierce, Opa Locka, and Miami. Truehill remained with the codefendants and, in Miami, Truehill again attempted to obtain money from Binder's accounts at a bank, using Binder's driver's license and his bankcard.

After Truehill and his codefendants lost the keys to the stolen truck, they abandoned the vehicle. Law enforcement officers found the stolen black truck in Miami, and inside the truck were bankcard receipts from Binder's accounts, a bloody Rambo-style knife, and a diploma and Social Security card belonging to Pavlish, among other incriminating items. Also in the vehicle was a green washcloth with blood on it that matched Binder's DNA in some places and had

mixed DNA profiles that showed Truehill, Binder, and Johnson were possible sources. Blood on the Rambo-style knife matched Binder's DNA, and a mixed DNA profile on that knife that matched Binder, Brown, Truehill, Hughes, and Johnson as possible contributors. Because investigators did not find blood inside the truck itself, the evidence demonstrated Binder was not killed in the truck.

After the codefendants were arrested, blood was found on two pairs of jeans in the codefendants' motel room. Testing on a pair of Levi's jeans showed that Binder was the major contributor for mixed DNA profiles, but Truehill, Johnson, Hughes, and Marcus were possible sources. The Giovanni blue jeans had a complete DNA profile that matched Binder, a DNA profile that matched Brenda Brown, and mixed DNA profiles where Johnson was found to be a possible minor contributor. The police also found a machete in the room, and DNA testing on the machete resulted in a partial DNA profile that was consistent with Truehill's DNA. Thus, the forensic testing of the washcloth, the knives, and the jeans indicates that Truehill was present for the murder. Further, based on the prior instances where Truehill previously robbed the other victims, the record establishes that Truehill possessed the murder weapon. Finally, Truehill was the defendant who possessed the victim's bankcard minutes after his disappearance. Accordingly, both the kidnapping and murder convictions are supported by competent, substantial evidence.

## VI. Denial of the Motion for New Trial

Turning to the penalty phase, Truehill alleges the trial court erred in denying his motion for new trial based on errors that occurred during this portion of the trial. To the extent that Truehill attempts to incorporate his motion for new trial by adopting and referencing each of the issues raised in his motion filed below, as this Court has previously held, a defendant cannot merely "incorporate[] the arguments in his [prior] motion by reference." Ferrell v. State, 29 So. 3d 959, 968 n.6 (Fla. 2010). Thus, these arguments are insufficiently pled. In addition, Truehill challenges three specific rulings the trial court made during the penalty phase, which we will address in turn.

First, Truehill contends that the trial court erred in granting the State's motion in limine, which sought to prevent Truehill from introducing an expert to discuss his "security evaluation" of Truehill and opine on Truehill's likelihood of a future escape from prison if he was sentenced to life instead of death. The State contended that such evidence would not be relevant mitigation in a penalty phase proceeding because it would not focus on the defendant's character, but instead would review the characteristics of a prison facility. Defense counsel responded, arguing that because the jury was already presented with information that Truehill and his codefendants escaped from a jail prior to committing the murder, the expert should be able to "render his opinion that it's unlikely that Mr. Truehill, based on

- 43 -

everything that he knows, would escape from prison." The trial court granted the State's motion in limine, reasoning that the likelihood of escape is not a character aspect of a defendant and is different from mitigation that focuses on whether the defendant is a peaceful person who can behave appropriately in prison. This expert was called during trial, but the State objected when his testimony began to focus on the adequacy of the jail facilities from which Truehill escaped and compared them to long-term incarceration facilities in Florida.

We conclude the trial court did not err in excluding testimony that focused on the characteristics of an incarceration facility, as opposed to Truehill's character. In a somewhat analogous situation, this Court held that the trial court did not err in excluding proffered expert testimony regarding Florida's parole procedures and a defendant's likelihood of being paroled if the jury did not vote for death, holding that such evidence did not concern the defendant's character. Merck v. State, 975 So. 2d 1054, 1059-60 (Fla. 2007); see also King v. Dugger, 555 So. 2d 355, 359 (Fla. 1990) (concluding that the trial court did not err in excluding testimony that a life sentence for first-degree murder includes a minimum mandatory sentence of twenty-five years of imprisonment because such evidence was not relevant to the defendant's character, his prior record, or the circumstances of the crime). Likewise, here, based on the record and the arguments presented, the defense sought to present the characteristics of various

prison systems to support the hypothesis that Truehill would not escape in Florida—a fact that does not involve Truehill's character, his record, or the circumstances of the crime.

Second, Truehill asserts that the trial court erred in denying two motions for mistrial made during the penalty phase when a State expert witness, Dr. Prichard, twice "ventured afield from the evidence and misled the jury with speculation." In support, Truehill points to two portions of the record. In the first instance at issue, Dr. Prichard testified that there were "probably more" gun-related offenses in Truehill's history. Defense counsel objected, and the trial court sustained the objection, providing a curative instruction to the jury. In the next instance, Dr. Prichard testified that because PTSD was not presented in Truehill's earlier Louisiana trial, it likely did not exist.

However, other than briefly describing these two events, Truehill's counsel provides no argument to support this subclaim. Accordingly, we deny this as insufficiently pled. Even if this Court reviewed this subclaim on the merits, Truehill would not be entitled to relief. As this Court has held, "The trial court should grant a motion for mistrial only 'when an error is so prejudicial as to vitiate the entire trial.'" Smith v. State, 170 So. 3d 745, 757 (Fla. 2015) (quoting Jackson v. State, 25 So. 3d 518, 528 (Fla. 2009)). "[T]his Court reviews a trial court's

ruling on a motion for mistrial under an abuse of discretion standard." Id. This standard has clearly not been met.

Finally, Truehill alleges that the trial court erred in denying a mistrial for prosecutorial misconduct based on closing arguments. Specifically, toward the end of the prosecutor's closing argument, the prosecutor stated, "It's been said that the dead cannot cry out for—." At the same time, the slide projector displayed a picture of the victim with the text: "The dead cannot cry out for justice. It is the duty of the living to do so for them." Defense counsel objected immediately, even though he did not have the chance to read it all. The trial judge also stated that he was unable to read it because the slide was taken away so quickly. The trial court denied the motion for mistrial and declined to provide a curative instruction, explaining that it would only highlight the error since it was visible for such a brief amount of time. The State alleges that this is not an improper argument.

We reject the State's argument because it was clearly an improper appeal to the jury's emotions, and, coupled with the actual photo of the victim with the caption, it had the potential alone for causing reversible error. Fortunately for the State, the defense counsel immediately recognized how inflammatory the captioned slide would have been and the trial court took prompt action. The prosecutor's insistence that this was permissible is of great concern.

- 46 -

Based on the fact that this slide was removed so quickly and neither counsel nor the court were able to read the caption by the time it was removed, we hold that the trial court did not abuse its discretion in denying the motion for mistrial. However, we strenuously condemn such tactics, which attempt to influence the jury to impose the harshest sentence by appealing to their prejudice or sympathy. Closing argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant." Cardona, 185 So. 3d at 520 (quoting Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985)). As we stated in Cardona:

> The State's burden is to prove the elements of the crime beyond a reasonable doubt. When the State instead uses closing argument to appeal to the jury's sense of outrage at what happened to the victim and asks the jurors to return a verdict that brings "justice" to the victim, the State perverts the purpose of closing argument and engages in the very type of argument that has been repeatedly condemned as antithetical to the foundation of our criminal justice system that guarantees a fair trial to every accused.

Id. at 519-20.

## VII.  Hurst Claim

The next issue addressed is whether Truehill is entitled to relief under Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), and Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016). New rules of law announced by this Court or the United States Supreme Court will apply to all cases that are pending on direct review or are otherwise not finalized. State v. Johnson, 122 So. 3d 856, 861 (Fla. 2013)

(citing Griffith v. Kentucky, 479 U.S. 314, 328 (1986); Smith v. State, 598 So. 2d 1063, 1066 (Fla. 1992)).  Therefore, Hurst v. Florida and Hurst apply to Truehill's case, which is before this Court on direct appeal.

Truehill contends that he is entitled to relief pursuant to Hurst v. Florida because the jury in his case was repeatedly instructed regarding the non-binding nature of its verdict, and, despite the unanimous jury recommendation, Hurst v. Florida error is structural and therefore not capable of harmless error review.  In Hurst, on remand from the United States Supreme Court, we determined that these errors are not structural and are therefore subject to harmless error review.  See Hurst, 202 So. 3d at 67.  After this Court's holding in Hurst, requiring that the jury unanimously find all facts necessary to impose a sentence of death and unanimously recommend death, there is no question whether there was Hurst error in Truehill's penalty phase, where the jury issued only an advisory recommendation of death, without more specific findings.  Accordingly, the issue before this Court is whether the Hurst error in Truehill's case was harmless beyond a reasonable doubt.

In Hurst, this Court explained the appropriate standard for harmless error review:

> Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence.  See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000).  Although the harmless error test applies to both constitutional errors

and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," [State v.] DiGuilio, 491 So. 2d [1129,] 1137 [Fla. 1986], and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Hurst, 202 So. 3d at 68. As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found all facts necessary to impose the death penalty and that the death penalty was the appropriate sentence. See Davis v. State, 41 Fla. L. Weekly S528 (Fla. Nov. 10, 2016).

Turning to Truehill's sentence, we emphasize the unanimous jury recommendation of death. The unanimous jury recommendation of death provides this Court with the evidence necessary to conclude beyond a reasonable doubt that a rational jury would have unanimously found that sufficient aggravating factors

existed to impose the death penalty and that those aggravating factors outweighed the mitigating circumstances presented.

In its instructions, the jury was informed that it needed to determine whether sufficient aggravators existed and, if so, whether the aggravation outweighed the mitigation before the death penalty could be imposed. Fla. Std. Jury Instr. (Crim.) 7.11 ("If . . . you determine that no aggravating circumstances are found to exist, or that the mitigating circumstances outweigh the aggravating circumstances, or, in the absence of mitigating factors, that the aggravating factors alone are not sufficient, you must recommend imposition of a sentence of life in prison without the possibility of parole rather than a sentence of death."). The jury ultimately returned a unanimous verdict of death based on the conclusion of all twelve jurors that sufficient aggravating circumstances existed and such aggravating circumstances outweighed the mitigating circumstances.

Even though the jury was not informed that the finding that sufficient aggravating circumstances outweighed the mitigating circumstances must be unanimous, and even though it was instructed that it was not required to recommend death even if the aggravators outweighed the mitigators, the jury did in fact recommend death unanimously. See id. ("If, after weighing the aggravating and mitigating circumstances, you determine that at least one aggravating circumstance is found to exist and that the mitigating circumstances do not

outweigh the aggravating circumstances, or, in the absence of mitigating factors, that the aggravating factors alone are sufficient, you may recommend that a sentence of death be imposed rather than a sentence of life in prison without the possibility of parole. Regardless of your findings in this respect, however, you are neither compelled nor required to recommend a sentence of death."). From these instructions, we can conclude that the jury unanimously made the requisite factual findings to impose death before it issued the unanimous recommendation. Further supporting that any Hurst error was harmless here, Truehill has not contested any of the aggravating factors as improper in the case at hand—Truehill's direct appeal.

Lastly, as to the mitigating circumstances, the jury was presented with evidence that included four statutory mitigating circumstances: (1) the defendant was under the influence of mental or emotional disturbance; (2) the defendant's capacity to appreciate the criminality of his conduct or conform to the requirements of law was substantially impaired; (3) the crime was committed by another person and Truehill had only a minor role; (4) Truehill acted under extreme duress or the substantial domination of another person. The jury was also presented with evidence of forty nonstatutory mitigating circumstances. Despite all of this evidence, the jury unanimously recommended a sentence of death,

indicating that all twelve jurors agreed that the mitigating evidence did not outweigh the six aggravating factors.

We conclude that the State can sustain its burden of demonstrating that any Hurst error was harmless beyond a reasonable doubt. Here, the jury unanimously found all of the necessary facts for the imposition of a death sentence by virtue of its unanimous recommendation. In fact, although the jury was informed that it was not required to recommend death unanimously, and despite the mitigation presented, the jury still unanimously recommended that Truehill be sentenced to death for the murder of Binder. The unanimous recommendation here is precisely what we determined in Hurst to be constitutionally necessary to impose a sentence of death. Hurst, 202 So. 3d at 44. Therefore, Truehill is not entitled to relief.

## VIII. Proportionality

Although Truehill does not raise this issue on appeal, this Court has an independent obligation to review the proportionality of a sentence of death regardless of whether it is raised by a party. See England v. State, 940 So. 2d 389, 407 (Fla. 2006); see also Fla. R. App. P. 9.142(a)(5). Because the death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist, this Court must undertake a "comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the

application of the sentence." Silvia v. State, 60 So. 3d 959, 973 (Fla. 2011) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). In performing this review, the Court considers the totality of the circumstances and compares the case with other similar capital cases. Duest v. State, 855 So. 2d 33, 47 (Fla. 2003). The Court does not simply compare the number of aggravating and mitigating circumstances, but rather performs a qualitative review of the underlying basis for each aggravating factor and mitigating circumstance. Silvia, 60 So. 3d at 973. In reviewing the sentence for proportionality, this Court will accept the jury's recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors. Id.

In this case, the jury recommended that Truehill be sentenced to death by a unanimous vote of twelve to zero. The trial court found six aggravating factors applied, analyzing each aggravator in great detail: (1) Truehill was under a sentence of imprisonment at the time of the crime; (2) he had a prior violent felony conviction; (3) the murder was committed while engaged in the commission of a kidnapping or robbery; (4) the murder was committed for the purpose of preventing a lawful arrest; (5) HAC; and (6) CCP. The judge assigned each of these aggravators great weight.

The trial court also considered the statutory mitigators, finding that Truehill had proven four of them: (1) the defendant was under the influence of mental or

emotional disturbance; (2) his capacity to appreciate the criminality of his conduct or conform to the requirements of law was substantially impaired; (3) the crime was committed by another person and Truehill had only a minor role; (4) Truehill acted under extreme duress or the substantial domination of another person. Factors 1-3 were given "less than slight weight," while factor 4 was given slight weight, with the trial court noting several concerns that it had regarding some of the factors. The court found Truehill failed to prove the statutory mitigator pertaining to Truehill's age at the time of the crime and thus gave it no weight. The court then weighed the nonstatutory mitigation, giving most of the mitigation little weight.[6]

_____

6. Specifically, the trial court found the following mitigators: (1) Truehill endured multiple acts of trauma in his life and has been diagnosed with PTSD (given slight weight); (2) Truehill lived in a dysfunctional family setting as a child (given slight weight); (3) Truehill's father was a strict disciplinarian (given less than slight weight); (4) Truehill believed his sister was his mother (given less than slight weight); (5) Truehill's father engaged in inappropriate verbal abuse of the children (given less than slight weight); (6) when Truehill's father declared that he intended to leave the family, he disclosed personal information about the children's mother (given slight weight); (7) Truehill's father divorced their mother and abandoned the home (given no weight); (8) after Hurricane Katrina, Truehill was unable to obtain government benefits because his mother claimed him as a dependent, but gave his room away to another person (given slight weight); (9) many of Truehill's siblings and family members were misplaced as a result of Hurricane Katrina (given less than slight weight); (10) Truehill's mother lost her home to foreclosure (given less than slight weight); (11) Truehill's father divorced his mother after permitting a stranger to move into their home and falling in love, which made Truehill bitter (given slight weight); (12) Truehill's parents divorced (given less than slight weight); (13) Truehill was tricked into attending his father's wedding (given less than slight weight); (14) after the divorce, Truehill began to

Finally, the trial court then analyzed whether a sentence of death was

appropriate based on an Enmund/Tison analysis and determined the death sentence

_____

associate with the wrong people (given slight weight); (15) Truehill participated in sports in middle and high school (given less than slight weight); (16) Truehill engaged in community service (given less than slight weight); (17) Truehill interacted well with underprivileged children (given less than slight weight); (18) Truehill worked as a juvenile at Baskin-Robbins (given less than slight weight); (19) Truehill's father refused to take him to basketball games (given less than slight weight); (20) Truehill's father did not attend either his junior high school or high school graduation (given less than slight weight); (21) Truehill experienced the tragic loss of his first serious girlfriend (given slight weight); (22) Truehill's first serious girlfriend lost a child to Sudden Infant Death Syndrome (given less than slight weight); (23) Truehill experienced the trauma of witnessing the unfolding of a retaliatory murder (given moderate weight); (24) Truehill knew about the retaliatory murder of a classmate in a high school gymnasium (given slight weight); (25) Truehill graduated from high school (given slight weight); (26) Truehill enrolled in and started classes to learn automobile collision repair (given slight weight); (27) Truehill was unable to transfer his enrollment to another public technical school (given slight weight); (28) during Hurricane Katrina, Truehill endured the storm and the chaos of the unexpected continually rising waters (given less than slight weight); (29) Truehill helped his girlfriend and her mother escape the flooding of Hurricane Katrina (given moderate weight); (30) Truehill jumped into the water to save his girlfriend when she fell out of the boat (given moderate weight); (31) Truehill lost his dogs as a result of Hurricane Katrina (given less than slight weight); (32) when escaping the flooding from Hurricane Katrina, Truehill was able to procure a car (given moderate weight); (33) Truehill lost his maternal grandparents' home based on damage from Hurricane Katrina (given slight weight); (34) Truehill never received any form of counseling or professional assistance (given slight weight); (35) Truehill and his mother love each other (given slight weight); (36) Truehill's aunt moved to be closer to him (given less than slight weight); (37) Truehill has family members who love him (given slight weight); (38) Truehill exhibited good behavior in court (given less than slight weight); (39) Truehill consistently exhibited good behavior while housed in the county jail (given less than slight weight); and (40) Truehill will adjust well to the prison setting in Florida (given slight weight).

was appropriate because Truehill was a major participant in Binder's murder and had demonstrated a reckless disregard for human life. The court weighed this aggravation against five statutory mitigating factors and forty nonstatutory mitigating circumstances and found a sentence of death was the appropriate sentence in this case.

In comparing this case to other capital cases, we conclude that a sentence of death is proportional to other cases where the sentence of death was imposed. In Tanzi v. State, 964 So. 2d 106 (Fla. 2007), the defendant strangled the victim to death during a kidnapping and robbery. Id. at 111. We found the sentence of death to be proportional based on six aggravators, including HAC, CCP and a prior violent felony. Id. at 121. While that case involved less mitigation, when examining the weight that the trial court gave to the mitigation in this case, with the exception of four nonstatutory mitigators that were given moderate weight, the trial court determined that the other mitigation was entitled to either slight weight or less than slight weight. We have also found the sentence of death to be proportional in similar types of cases where there was significantly less aggravation. See, e.g., Singleton v. State, 783 So. 2d 970, 972-73, 980 (Fla. 2001) (holding the sentence of death to be proportional where the defendant stabbed the victim multiple times and the trial court found a prior violent felony and HAC, three statutory mitigating circumstances, and nine nonstatutory mitigating

circumstances, including that the defendant was under the influence of extreme emotional disturbance and his capacity to conform his conduct to the requirements of law was substantially impaired); Pham v. State, 70 So. 3d 485, 500-01 (Fla. 2011) (holding death sentence proportional in stabbing murder for which trial court found four aggravators—prior violent felony conviction, HAC, CCP, and committed in the course of a burglary or kidnapping—and numerous mitigation, including under influence of mental or emotional disturbance, somewhat impaired capacity to appreciate criminality or conform to requirements of law, traumatic childhood, and stable employment history); Banks v. State, 46 So. 3d 989, 994, 1000 (Fla. 2010) (holding death sentence proportional for stabbing murder where the trial court found HAC, CCP, and prior violent felony conviction aggravators, and five mitigating circumstances—low IQ, brain deficit, antisocial personality traits, not the only participant, and difficult youth).

Further, we must consider relative culpability. As this Court has held, "When a codefendant is equally as culpable or more culpable than the defendant, the disparate treatment of that codefendant may render the defendant's punishment disproportionate." Sexton v. State, 775 So. 2d 923, 935 (Fla. 2000). "[I]f the defendant is the more culpable participant in the crime, disparate treatment of the codefendant is justified." Id.

One of the codefendants—Hughes—has been sentenced to life without the possibility of parole after he pled guilty. However, this life sentence does not render a death sentence for Truehill disproportionate because Hughes was clearly the least culpable. The evidence from trial establishes that Hughes was the defendant who primarily served as the lookout in the various crimes and was not generally seen brandishing either of the murder weapons.

The other codefendant, Johnson, was convicted and sentenced to death for the kidnapping and murder of Binder but his case is still pending before this Court on appeal. See Johnson v. State, No. SC14-1966 (remanded for evidentiary hearing Sept. 29, 2016). In this case, when reviewing the Enmund issue, the trial court undertook a detailed analysis as to Truehill's culpability and found as follows:

> Mr. Truehill and his codefendants were in a crime spree. [Truehill's] role in each offense was a prominent and active one. That means that he wasn't a getaway driver or "lookout." The evidence shows to the contrary. His role was an active one in that he would be physically in contact with the victims. He was the one who held Mr. Rios during the attempted robbery of Mr. Rios just a couple of hours before Mr. Binder was kidnapped. It was Mr. Truehill who struggled with Ms. Pavlish over her purse during the robbery of Ms. Pavlish, again, just a couple of hours before Mr. Binder was robbed and kidnapped. It was Mr. Truehill who always brandished the knife during these events. And it was on his hand that the murder weapon was seen shortly before the robbery and kidnapping of Mr. Binder.

These findings are supported by competent, substantial evidence in the record. Further, Truehill was the person who actually possessed Binder's bankcard

minutes after his disappearance and his DNA was clearly on the murder weapon.

Upon a full review, we conclude the record firmly establishes that Truehill was

equally or more culpable than codefendant Johnson and thus the death penalty is

not disproportionate.

## CONCLUSION

Based on the foregoing, we affirm Truehill's convictions and his sentence of

death.

It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
PARIENTE, J., concurs with an opinion.
CANADY, J., concurs in the conviction and concurs in result as to the sentence.
POLSTON, J., concurs in result.
QUINCE, J., concurs as to the conviction and dissents as to the sentence, with an
opinion.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

PARIENTE, J., concurring.

I write to address the dissent's argument that, despite the unanimous jury

recommendation for death, the <u>Hurst</u> error in Truehill's case cannot be considered

harmless beyond a reasonable doubt because three of the six aggravating factors

presented to the jury required a factual determination.

In this case, three of the six aggravating factors—that Truehill was under a

sentence of imprisonment at the time of the crime; that Truehill had a prior violent

felony; and that Truehill committed the murder while engaged in the commission of a kidnapping or robbery—did not require the jury to make a separate factual determination to establish that the aggravating factor was proven beyond a reasonable doubt. Although I agree that, under <u>Hurst</u>, only the aggravating factors found unanimously by the jury can be considered in determining the sufficiency of the aggravating factors, whether all twelve jurors unanimously agreed on each of the remaining three aggravating factors does not alone render the jury's unanimous recommendation per se harmful. Rather, what we know is that the jury unanimously determined that there were sufficient aggravating factors to outweigh the mitigating circumstances and unanimously recommended death as the appropriate penalty. Further, none of the aggravating factors that the State and the trial court relied on in imposing death were challenged by Truehill or deemed improper by this Court. Considering the circumstances of this crime, including the aggravating factors and the mitigating circumstances, I agree with the majority that any <u>Hurst</u> error in this case was harmless beyond a reasonable doubt.

For these reasons, I concur.

QUINCE, J., concurring in part and dissenting in part.

I concur with the majority's finding that the evidence here is sufficient to sustain Truehill's convictions. However, I cannot agree with the majority's finding

that the Hurst error was harmless beyond a reasonable doubt. To the extent that I would not find the error harmless, I dissent.

In Hurst, we held that for a defendant to be eligible for the death sentence, a jury must unanimously find the existence of each aggravating factor, that the aggravating factors are sufficient, and that the aggravating factors outweigh the mitigating circumstances. Hurst, 202 So. 3d at 44. Additionally, we held that the jury's death sentence recommendation must be unanimous. Id. While I agreed in Hurst that Hurst v. Florida errors are subject to harmless error review, see id. at 68, I do not believe that we can ever find Hurst error harmless when there are aggravating circumstances that require a factual determination based on evidence presented to the jury. Because Hurst requires that "requires a jury, not a judge, to find each fact necessary to impose a sentence of death," see Hurst v. Florida, 136 U.S. 616, 619 (2016), the error cannot be harmless where such a factual determination was not made.

The aggravating circumstances in this case were: (1) Truehill was under a sentence of imprisonment at the time of the crime; (2) Truehill had a prior violent felony; (3) Truehill committed the murder while engaged in the commission of a kidnapping or robbery; (4) the murder was committed for the purpose of preventing a lawful arrest; (5) the murder was especially heinous, atrocious, or cruel (HAC); and (6) the capital felony was committed in a cold, calculated, and

premeditated manner without any pretense of moral or legal justification (CCP).

Three of these aggravators are established without a factual determination by the

jury, but the remaining aggravators each required factual findings that, under

Hurst, must now be considered and weighed by a jury. As we stated in Hurst,

without an interrogatory verdict, we cannot determine which aggravators the jury

unanimously found beyond a reasonable doubt. See Hurst, 202 So. 3d at 67.

In Hurst, we declined to speculate why the jurors voted the way they did, yet

because here the jury vote was unanimous, the majority is comfortable determining

that all twelve jurors determined "that sufficient aggravating circumstances existed

and that such aggravating circumstances outweighed the mitigating

circumstances." Maj. op. at 50. Even though the jury unanimously recommended

the death penalty, whether the jury unanimously found each aggravating factor

remains unknown. Furthermore, because the jury was instructed that it need only

find one aggravating circumstance ("If . . . you determine that at least one

aggravating circumstance is found to exist . . . ."), it is unclear from the record

whether the jury truly did unanimously find that sufficient aggravating

circumstances existed.

The majority's reweighing of the evidence to support its conclusion is not an

appropriate harmless error review. The harmless error review is not a sufficiency

of the evidence test, and the majority's analysis should instead focus on the effect

of the error in the trier of fact.  State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986).  By ignoring the record and concluding that all aggravators were unanimously found by the jury, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against in Hurst v. Florida.  See Hurst v. Florida, 136 S. Ct. 616, 622 (2016).  Because the harmless error review is not a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," DiGuilio, 491 So. 2d at 1138, I conclude that the error here was harmful.

An Appeal from the Circuit Court in and for St. Johns County,
     Raul Antonio Zambrano, Judge – Case No. 552010CF000763XXAXM

James S. Purdy, Public Defender, and George Donald Edward Burden and John M. Selden, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

     for Appellee